.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

**JUL 2 1 2017**

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES OF AMERICA

v.

CRIMINAL NO. 16-cr-00163 (CKK)

**CRISTIAN FLAMANZEANU**
**ALSO KNOWN AS "CHRISTIANO**
**FLAMANZEANU"**

**Defendant**

## STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, CRISTIAN FLAMANZEANU, with the concurrence of his attorney, agree and stipulate as follows:

### Introduction

1. Defendant CRISTIAN FLAMANZEANU, also known as "Christiano Flamanzeano," was a resident and citizen of Romania.

2. Co-Conspirator 10 ("CC-10"), Co-Conspirator Daniel Alexandru Ciomag ("Ciomag"), and Co-Conspirator 22 ("CC-22"), were residents and citizens of Romania.

3. Co-Conspirator Sabina Selimovic ("Selimovic") was a resident of Germany and a citizen of Serbia.

4. Co-Conspirator Harry Meir Mimoun Amar ("Amar") was a resident and citizen of Israel.

5. Co-Conspirator 7 ("CC'7") was a resident and citizen of Hungary.

CF

**The Conspiracy to Commit the Business Email Compromise Scheme**

6.      From in or around April 2014, through in or around March 2015, within the District of Columbia and elsewhere, defendant FLAMANZEANU, together with other co-conspirators, did knowingly and intentionally conspire, combine, confederate, and agree to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme and artifice, to transmit and cause to be transmitted in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343 (wire fraud).

A.      **Background on the Business Email Compromise Scheme**

7.      Beginning in or around April 2014, and continuing through in or around March 2015, defendant FLAMANZEANU, together with other co-conspirators, executed an international, cyber-enabled fraud scheme commonly referred to as a "Business Email Compromise" or "BEC" scheme (hereinafter referred to as the "BEC scheme").

8.      It was part of that scheme that FLAMANZEANU, together with his co-conspirators, deceived mid-level employees of target companies, who maintained access to and control over the target companies' bank accounts, convincing those employees to transfer large sums of money to bank accounts opened and controlled by other co-conspirators.

9.      In executing the BEC scheme, FLAMANZEANU, together with his co-conspirators, targeted mid-sized and large companies through "spoofed" emails, that is, emails that purported to come from someone else, by co-conspirators impersonating executive-level employees of the companies, such as the President and Chief Executive Officer ("CEO") of a company.

CF

10.     Once an employee of a target company had been "hooked" by a co-conspirator, the company employee was led to believe that they were being entrusted to handle a large financial transaction, such as a "secret" corporate acquisition.  The employee was then instructed by the co-conspirators to initiate wire transfers from the company's corporate bank accounts to bank accounts controlled by members of the criminal enterprise to pay for the alleged corporate acquisition.

11.     To fraudulently induce the employee to initiate the wire transfer of money, the co-conspirators created fake non-disclosure agreements appearing to come from the European Securities and Markets Authority (or "ESMA").  The ESMA non-disclosure agreements were sent by the co-conspirators, through email, to the mid-level employees at the victim companies.  The co-conspirators then instructed the mid-level employees to execute the agreements because the purported corporate transaction was highly confidential and could not be shared with anyone.  The non-disclosure agreements, however, needed to be signed by the actual high-ranking corporate official at the victim company who were being impersonated by the co-conspirators.  Thus, the co-conspirators would find the high-ranking officials' signatures on publicly filed documents and through internet databases and would copy those signatures onto the phony contracts.

12.     The co-conspirators would also contact the mid-level employees at the victim companies by telephone, posing as outside counsel assisting the high-ranking corporate official in the phony corporate transaction.  To add to the supposed legitimacy of the transaction, the co-conspirators would also create fake websites for the attorneys and would manipulate Google search engine results to ensure that, if the employees ever attempted to look-up the purported outside counsel, the employees would find the fraudulent attorney's website.

13.     Once the co-conspirators successfully persuaded the employees at the victim companies to transfer money to the co-conspirators' bank accounts, the funds were quickly wire transferred out of reach of the victim company by members of the conspiracy and into bank accounts located in the People's Republic of China and elsewhere, with the funds ultimately being delivered to co-conspirators located in Europe and elsewhere.

**B.      The Technical Aspects of the BEC Scheme**

14.     The co-conspirators created the "spoofed" emails by using a fee-based Internet database to learn which employees at the target companies likely had the authority to transfer large sums of money to external bank accounts.  The co-conspirators also used those databases to learn the email addresses for the presidents, CEOs, and CFOs of the target companies.

15.     The co-conspirators then purchased domain names from a United States-based domain name registrar.  They would purchase domain names that closely mimicked the actual domain names of the victim companies in order to trick the companies' employees into believing that the emails the co-conspirators sent from the fraudulent domain names were actually being sent from an executive-level employees of the target companies.

16.     The co-conspirators chose to purchase the domain names from this United States-based registrar because: (1) the registrar accepted payment in the form of Bitcoin, which is a virtually untraceable electronic fiat currency; and (2) the registrar offered services which anonymized the creator of the domain name thereby preventing others from determining who, in fact, truly created that domain name.  To purchase the domain names from this registrar, the co-conspirators initiated the transfer of Bitcoin through the Internet to the domain name registrar's servers located in the United States.

17.     Once the co-conspirators purchased the domain names, they then used Mozilla Thunderbird, which is an email program, to make the domain names appear identical to the victim companies' actual domain names. The co-conspirators then sent their spoofed emails to the target companies by re-configuring the Simple Mail Transfer Protocol ("SMTP") settings in Mozilla Thunderbird to utilize the servers of well-known email providers in the United States to ensure that their fraudulent emails actually reached the employees of the target companies and were not stopped by the victim companies' spam filters.

18.     The co-conspirators also purchased domain names, from the same United States-based domain name registrar, to create the websites for fictitious outside counsel that were purportedly working on the transaction and that, when viewed by the employees of the target companies, would backstop the co-conspirators' fraudulent representations.

19.     The co-conspirators also communicated through electronic means, such as by text messages and online chat communications, through United States-based messaging applications, such as WhatsApp and Wickr.

C.     **The Use of "Safe Houses"**

20.     The co-conspirators, including FLAMANZEANU, executed the BEC Scheme out of a base of operations, also known as "safe houses," which they periodically moved from country to country. The co-conspirators maintained the "safe houses" in different countries from those in which the target companies were located and from those in which the bank accounts receiving monetary transfers of criminal proceeds were opened.

21.     The co-conspirators used Virtual Private Networks ("VPNs"), which is technology that allowed them to hack into and route Internet traffic through Wi-Fi networks in the vicinity of

the "safe houses," voice-changing software, and other technical exploitations, in order to avoid detection by law enforcement and the target corporations.

**D.      Flamanzeanu's Role in the BEC Scheme**

22.      Defendant FLAMANZEANU is a skilled graphic designer with prior experience using design programs, such as Microsoft Photoshop.  FLAMANZEANU's primary role in the BEC Scheme was to use his design skills to assist in copying the signatures of the high-ranking corporate officials onto the fraudulent ESMA non-disclosure agreements that were sent to the mid-level employees of the target companies.  FLAMANZEANU also assisted in creating variations of the high-ranking officials' signatures to make them appear more authentic.  In addition, FLAMANZEANU used his design skills to assist in the creation of the "spoofed" emails by inserting corporate logos into those emails, thereby making those emails appear legitimate to the recipient.

23.      When the BEC Scheme began in 2014, defendant FLAMANZEANU was working as the Art Director for a company in Bucharest, Romania, that developed games and applications (or "apps") for mobile telephones.  FLAMANZEANU's employer was an acquaintance of co-conspirator Ciomag.  FLAMANZEANU hoped to someday develop his own games and apps for mobile telephones and was seeking funding for that purpose.

**Flamanzeanu's Execution of the BEC Scheme**

24.      In or around May 2014, FLAMANZEANU was sent to Antalya, Turkey, by his employer under the false pretense that FLAMANZEANU would use his design skills to assist others in "cleaning up" confidential corporate documents.  For his efforts, FLAMANZEANU's employer agreed to pay FLAMANZEANU approximately €3,000 per month.  FLAMANZEANU was unaware, at the time, that he was going to be involved in the BEC Scheme.

25.     When FLAMANZEANU arrived at the "safe house" in Turkey, co-conspirators Ciomag and CC-10, along with CC-22, were already present.   Over the next few weeks, FLAMANZEANU stayed in a room separate from Ciomag and CC-10, and Ciomag provided FLAMANZEANU with USB flash drives containing signatures that needed to be "cleaned-up" or remade.   FLAMANZEANU then used his design skills to make those signatures appear less pixelated, and thereby more authentic, and returned those "cleaned-up" signatures to Ciomag on the same flash drive.   After working for a couple of weeks in the safe house, FLAMANZEANU realized that he was engaged in a fraudulent scheme to defraud corporate entities of their money but did not understand the full details and scope of that fraud scheme.

26.     On or about June 18, 2014, CC-10, Ciomag, CC-22, and FLAMANZEANU, fraudulently caused a Spanish company, herein designated as Victim 9, to wire transfer €283,400 to a bank account in Hungary provided by CC-7.   Following this successful fraud attack, the co-conspirators, including FLAMANZEANU, left Turkey due to visa restrictions. FLAMANZEANU then returned home to Romania.

27.     Before leaving Romania, however, Ciomag provided FLAMANZEANU with a cellular phone and instructed FLAMANZEANU to keep the phone powered on.   Ciomag eventually called FLAMANZEANU and asked FLAMANZEANU to join the co-conspirators in their new safe house in Varna, Bulgaria. At the time, FLAMANZEANU was still interested in developing a mobile application and needed funding. Ciomag and CC-10 promised to provide FLAMANZEANU with €30,000 (approximately $40,000 USD) in funding for his app if he remained in the conspiracy. FLAMANZEANU then decided to join the conspirators in Bulgaria in or about June 2014.

CF

28.     In Bulgaria, FLAMANZEANU continued to "clean-up" the signatures of the high-ranking corporate officials that were used in the fraudulent contracts for the BEC Scheme. FLAMANZEANU also worked on the corporate logos that were inserted into the fraudulent emails that were sent to the employees at the victim companies.  The initial members of the conspiracy in Bulgaria were CC-10, Ciomag, CC-22, and FLAMANZEANU.

29.     In or around July 2014, co-conspirators Amar and Selimovic traveled to Bulgaria to join the conspiracy with CC-10, Ciomag, CC-22, and FLAMANZEANU.  The co-conspirators then decided to target German companies, among others, because Selimovic was fluent in German and professed to have success in executing similar BEC schemes in Israel.  Selimovic talked to victim companies on the phone, posing as the lawyer, and Amar assisted the co-conspirators, among other things, in composing the fraudulent emails to the victim companies.  Following the arrival of Amar and Selimovic, FLAMANZEANU began to understand in greater detail how the BEC Scheme operated, such as that the scheme involved defrauding companies through emails. In the Bulgarian safe house, FLAMANZEANU began to receive the full corporate documents with signatures from Ciomag to work on, rather than just the signatures of the corporate officials, and manipulated those corporate documents to facilitate the BEC Scheme.

30.     In or around July 2014, through in or around August 2014, while the "safe house" was operating in Bulgaria, co-conspirators Amar, Selimovic, CC-10, Ciomag, CC-22, and FLAMANZEANU, through false representations, caused a German company, herein designated as Victim 6, to wire transfer approximately €550,000 to a bank account controlled by the co-conspirators.[1]

---

[1] The approximate amount in U.S. dollars was $723,250, based on the lowest Federal Reserve noon buying rate (the "exchange rate") for the period from July 1, 2014, through August 29, 2014. *See* http://www.federalreserve.gov/releases/h10/hist/dat00.

31.     On or about August 7, 2014, defendant FLAMANZEANU and his co-conspirators caused a Finnish company, herein designated as Victim 10, to attempt to wire transfer €383,400[2] from the company's bank account to a bank account in Hungary provided by CC-7.  The transaction, however, was able to be reversed and the funds returned to the victim.

32.     In or around August and September 2014, CC-10, Ciomag, Selimovic, Amar, CC-22, and FLAMANZEANU caused a company based in Portugal, herein designated as Victim 5, to wire transfer approximately $380,000 to a bank account in China.

33.     In September 2014, the co-conspirators left the safe house in Bulgaria. FLAMANZEANU returned home to Romania and was told again, by Ciomag, to keep the cell phone Ciomag gave FLAMANZEANU turned on.  While FLAMANZEANU was in Romania, Ciomag contacted FLAMANZEANU again and informed FLAMANZEANU that he was needed in the conspirators' new safe house in Prague, Czech Republic.  FLAMANZEANU then traveled to Prague, again under the belief that Ciomag would provide the funding necessary for FLAMANZEANU to develop his mobile gaming application.

34.     In or around October or November 2014, CC-10, Ciomag, Selimovic, CC-22, and FLAMANZEANU began operating the BEC scheme from the safe house in Prague.  At this location, FLAMANZEANU continued to work on the forged signatures used in the fraudulent contracts and worked on the corporate logos inserted in the fraudulent emails.

35.     On or about November 10, 2014, defendant FLAMANZEANU, and his co-conspirators, through false representations concerning a purported corporate acquisition, caused an accountant employed at a company located in Germany, herein designated as Victim 1, to wire transfer approximately €570,000 from a bank account in Germany to a bank account in Hungary.[3]

---

[2] The amount in U.S. dollars was $407,648, based on the exchange rate for that date.
[3] The amount in U.S. dollars was $708,225, based on the exchange rate for that date.

36.     On or about November 12, 2014, based on continuing false representations concerning a purported corporate acquisition, Victim 1 wire transferred an additional amount of approximately €570,000[4] from a bank account in Germany to the bank account in Hungary.

37.     On or about November 17, 2014, based on continuing false representations concerning a purported corporate acquisition, Victim 1 wire transferred an additional amount of approximately €855,000[5] from a bank account in Germany to the bank account in Hungary.

38.     On or about November 18, 2014, based on continuing false representations concerning a purported corporate acquisition, Victim 1 was directed to wire an additional amount of approximately €1,564,080[6] from a bank account in Germany to the bank account in Hungary. On or about November 18, 2014, Victim 1 discovered the scheme and did not initiate the additional wire transfer of €1,564,080.

39.     On or about November 26, 2014, CC-10, Ciomag, Selimovic, CC-22, and FLAMANZEANU, through false representations concerning a purported corporate acquisition, caused an employee in the accounting department at a company located in Germany, herein designated as Victim 4, to wire transfer approximately €570,000[7] from a bank account in Germany to a bank account in Hungary.  CC-10 obtained the bank account information for the account in Hungary from CC-7.

40.     On or about November 28, 2014, based on continuing false representations, Victim 4 wire transferred an additional €850,000[8] from a bank account in Germany to the bank account in Hungary.

---

[4] The amount in U.S. dollars was $709,992, based on the exchange rate for that date.
[5] The amount in U.S. dollars was $1,064,218.50, based on the exchange rate for that date.
[6] The amount in U.S. dollars was $1,960,417.87, based on the exchange rate for that date.
[7] The amount in U.S. dollars was $712,671, based on the exchange rate for that date.
[8] The amount in U.S. dollars was $1,057,230, based on the exchange rate for that date.

41.     On or about December 2, 2014, based on continuing false representations, Victim 4 wire transferred an additional €850,000[9] from a bank account in Germany to the bank account in Hungary.

42.     On or about December 2, 2014, based on continuing false representations, Victim 4 wire transferred an additional €850,000[10] from a bank account in Germany to the bank account in Hungary.

43.     On or about December 3, 2014, based on continuing false representations, Victim 4 wire transferred an additional €1,700,000[11] from a bank account in Germany to the bank account in Hungary.

44.     On or about December 9, 2014, based on continuing false representations, defendant FLAMANZEANU, together with others, caused Victim 4 to wire transfer €1,100,000 from a bank account in Germany to a bank account in China provided to CC-10 by CC-7.[12]

45.     The co-conspirators eventually left Prague, and FLAMANZEANU returned home to Romania. Again, while in Romania, FLAMANZEANU was instructed by Ciomag to keep the cellular phone Ciomag gave to FLAMANZEAU turned on. Eventually, FLAMANZEANU received a call from Ciomag telling FLAMANZEANU that his assistance was needed at the conspirators' new safe house in Warsaw, Poland. FLAMANZEANU, believing that his continued assistance in the BEC Scheme would result in Ciomag funding the development of his "app," traveled to Warsaw.

46.     The co-conspirators operating in the Warsaw safe house consisted of CC-10, Ciomag, Selimovic, and FLAMANZEANU. Despite repeated attempts, they were not successful

---

[9] The amount in U.S. dollars was $1,053,150, based on the exchange rate for that date.
[10] The amount in U.S. dollars was $1,053,150, based on the exchange rate for that date.
[11] The amount in U.S. dollars was $2,091,680, based on the exchange rate for that date.
[12] The amount in U.S. dollars was $1,365,650, based on the exchange rate for that date.

in defrauding any companies while there.   The co-conspirators eventually left Warsaw and relocated to their final safe house in Bratislava, Slovakia.   The group in Bratislava consisted of CC-10, Ciomag, Selimovic, and FLAMANZEANU.

47.     On or about March 5, 2015, CC-10, Ciomag, Selimovic, and FLAMANZEANU, through false representations concerning a purported corporate acquisition, caused a German company, herein designated as Victim 2, to wire transfer €570,000[13] from a bank account in Germany to a bank account in Poland provided to CC-10 by CC-7.

48.     On or about March 10, 2015, CC-10, Ciomag, Selimovic, and FLAMANZEANU, through false representations concerning a purported corporate acquisition, caused a German company, herein designated as Victim 3, to attempt a wire transfer of €750,000[14] from a bank account in Germany to a bank account in Hungary provided to CC-10 by CC-7.   Victim 3 was able to terminate the wire transaction.

49.     While in the safe house in Bratislava, law enforcement arrested CC-10.   Ciomag and FLAMANZEANU fled the location.   FLAMANZEANU had no contact with any of the aforementioned co-conspirators since that time.   FLAMANZEANU also never received any funding for the mobile phone application that he was developing.

## Limited Nature of Proffer

This proffer of evidence is not intended to constitute a complete statement of all facts known by the defendant or the government, but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. As to the other named defendants and the charges in the Superseding Indictment, the defendant admits that the allegations in the

---

[13] The amount in U.S. dollars was $627,342, based on the exchange rate for that date.
[14] The amount in U.S. dollars was $803,025, based on the exchange rate for that date.

CF

indictment are true or that he does not have information to dispute or disprove those allegations set forth in the Superseding Indictment in any way.

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney
D.C. Bar No. 415793

By: _____

DIANE G. LUCAS, D.C. Bar No. 443610
DAVID B. KENT, D.C. Bar No. 482850
MICHAEL J. MARANDO, N.Y. Bar No. 482850
Assistant United States Attorneys
(202) 252-7724 (Lucas)
(202) 252-7762 (Kent)
(202) 272-7068 (Marando)
Diane.Lucas@usdoj.gov
David.Kent@usdoj.gov
Michael.Marando@usdoj.gov

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me regarding these offenses. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crimes charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.


Dated:   7/21/17 .                     _____
                                        CRISTIAN FLAMANZEANU
                                        Defendant


## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.


Dated:   7/21/17                       _____
                                        JOHN CARNEY
                                        Attorney for Defendant Cristian
                                        Flamanzeanu