IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    )
                             )
     Government,             )
                             )
     v.                      )   Criminal No. 16-163-4
                             )
CRISTIAN FLAMANZEANU,        )
                             )   Washington, D.C.
     Defendant.              )   July 21, 2017
_____)

TRANSCRIPT OF PLEA HEARING

BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY

UNITED STATES DISTRICT JUDGE

Court Reporter:

Richard D. Ehrlich, RMR, CRR
Official Court Reporter
United States District Court
333 Constitution Avenue, NW
Washington, D.C. 20001
(202) 354-3269

Proceedings reported by stenotype.

Transcript produced by computer-aided transcription.

```
1                        A P P E A R A N C E S

2

3

4      For the Government:    MICHAEL JOHN MARANDO
                              DIANE G. LUCAS
5                             U.S. ATTORNEY'S OFFICE
                              555 Fourth Street, NW
6                             Washington, D.C. 20530
                              (202) 252-7724
7

8

       For The Defendant:     JOHN JAMES CARNEY
9                             CARNEY & CARNEY
                              601 Pennsylvania Avenue, NW
10                            Washington, D.C. 20004
                              (202) 434-8234
11

12

13     Defendant, Cristian Flamanzeanu, present in person.

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good afternoon everyone.

2          Call the case, and we'll swear in the interpreter.

3          THE CLERK:  Criminal Action 16-163-4.  *United*

4  *States of America vs. Cristian Flamanzeanu.*

5          Will counsel please approach the podium and

6  identify yourselves for the record?

7          MR. MARANDO:  Good afternoon, Your Honor.  Michael

8  Marando and Diane Lucas for the Government.

9          THE COURT:  Good afternoon.

10          MR. CARNEY:  Good afternoon, Your Honor.

11  John Carney on behalf of Cristian Flamanzeanu.

12          THE COURT:  All right.  Good afternoon.  And we

13  have an interpreter, a Romanian interpreter.

14                      INTERPRETER, SWORN

15          THE COURT:  My understanding is that

16  Mr. Flamanzeanu does speak English; however, it's my

17  practice to have an interpreter.  Since English is not your

18  first language, as I understand it, to have an interpreter

19  available.  Pleas are somewhat complicated.  If at any time

20  you need assistance, you should just simply indicate it so

21  that she will translate or interpret for you what you're not

22  sure you understand.  Okay?  Don't be shy about that.  I

23  want to make sure there's no misunderstanding about what

24  you're agreeing to.  All right?

25          Okay.  The other question is we have a redacted

1    and unredacted statement of offense.  The unredacted one has

2    already been filed under seal, and my understanding is that

3    Mr. Flamanzeanu would've signed the unredacted one so that

4    we have him admitting he knows who the person is; is that

5    correct?  I mean, I take it he knows who it is?

6         MR. MARANDO:  That's correct, Your Honor.  The

7    Government provided Mr. Flamanzeanu with a copy of the

8    unredacted statement of offense, and he has had time to

9    review it.

10        THE COURT:  All right.  Obviously, when I go

11   through this, I'm not going to put in the real name of C22.

12   We'll just simply say "C22," but I want to make sure that

13   you're in agreement that the person that was identified in

14   the unredacted version, that you agree that that is C22.

15   Okay?  And I'll ask this under oath, but I just wanted to

16   make sure we had set this up correctly.

17        So we'll proceed with it -- and I don't think we

18   need to put it under seal, you know, the proceedings.  Do we

19   need to put it under seal?  We won't mention who it is.

20        MR. MARANDO:  Your Honor, these proceedings do not

21   need to be under seal.

22        THE COURT:  I'm sorry?

23        MR. MARANDO:  These proceedings do not need to be

24   under seal.

25        THE COURT:  Okay.

1          MR. MARANDO:  Your Honor, and I apologize.  My

2     co-counsel and I are sitting here murmuring to each other.

3     We just want it to be clear that there is actually more than

4     one individual that we are referring to by acronym.  It's

5     not just CC22, but it's CC10.

6          THE COURT:  Okay.  I forgot about that.

7          MR. MARANDO:  It's the other individual and CC7.

8          THE COURT:  Okay.  So what I'll do, when I reach

9     the point of doing the statement of offense, I'll simply

10    make sure that those individuals that have actually been

11    named in the unredacted version, that he agrees that that's

12    who they are and he agrees to what their role is.  I will be

13    asking you those questions, and then we can proceed with the

14    redacted version as long as he signed the unredacted version

15    in addition to the redacted one.  Has he done that?

16         MR. CARNEY:  Yes, Your Honor.

17         THE COURT:  And we'll just put the signed one

18    under seal along with the statement of offense.

19         MR. MARANDO:  The only question I would have, Your

20    Honor, if --

21         THE COURT:  If you can be in front of that

22    microphone.

23         MR. MARANDO:  I'm sorry.  The only question I

24    would have, Your Honor, is for the true identities of CC10

25    and CC7, we would prefer not to put those on the record in

1    open court.

2              THE COURT:  I wasn't going to say who they are.

3    I'm just telling you what I think I'm going to do.

4              MR. MARANDO:  Okay.

5              THE COURT:  I'm going to ask whether, in the

6    unredacted version where they indicate C22, C7, C10, he has

7    seen these individuals, he knows them, and what's been

8    described as their actions are accurate, and he's agreeing

9    to that.  We'll just, for the public, you know, for an

10   unsealed proceeding, we don't need to give the names as long

11   as he's agreed to who they actually are and their roles.

12             MR. MARANDO:  Thank you, Your Honor.

13             THE COURT:  All right.  I think then,

14   Mr. Flamanzeanu, if you would come up.

15             One thing I will mention is that some of these

16   names, I must admit I'm not sure how to say them.  So what I

17   might do when I get there is to have somebody indicate what

18   the names are.  I will do sort of a phonetic thing here and

19   hopefully not butcher the names too much.

20             All right.  If we can swear him in.

21              CRISTIAN FLAMANZEANU, DEFENDANT, SWORN

22   BY THE COURT:

23        Q    Okay.  Mr. Flamanzeanu, as I indicated to you, we

24   have the Romanian interpreter.  If at any time you need

25   assistance with what's being said, or your answer, or the

1    questions that are being asked, please don't hesitate to

2    indicate that, and she will assist you.  All right?

3         A    Okay.

4         Q    So you've now been placed under oath, and I want

5    to make sure that you understand that if you don't answer my

6    questions truthfully, you could be prosecuted for perjury or

7    for making a false statement.  Do you understand that?

8         A    Yes, ma'am, I understand.

9         Q    Okay.  You need to speak up a little bit and speak

10   into the microphone.

11        A    Yes, I understand.

12        Q    Okay.  I'm going to go through all of these

13   questions, and I will go through the statement of offense.

14   I want to make sure that this is what you actually want to

15   do.  You can't come back in a week or two and say, "Well,

16   Judge, you know, I changed my mind."

17             So we need to make sure you thought this through,

18   and this is what you want to do.

19             The other thing is we need to put on the record,

20   either orally or in writing, what is part of the agreement.

21   So if there's something that's part of the agreement that is

22   not in writing in the plea agreement, or we don't bring it

23   up, you can't come back later and say, "Well, I thought this

24   or that was part of it."

25             You need to bring everything up that you think is

1    part of the agreement.  All right?

2        A    Okay.

3        Q    So let me start by just simply indicating that the

4    original charges were -- it's an indictment, Count 1,

5    conspiracy to commit wire fraud and forfeiture allegations.

6    You are pleading to that Count 1, the conspiracy to commit

7    wire fraud in accepting the forfeiture allegation.

8            The other part of this is that you're agreeing,

9    pending sentencing, to be held without bond, and the

10   Government will be making recommendations, and there are

11   certain things that they've agreed to in the plea letter,

12   but they have not waived allocution; in other words, they

13   have not agreed to be silent at sentencing.  They will be

14   able to make recommendations to the Court.  Is that your

15   understanding of just the basic agreement?

16       A    Yes.

17       Q    Okay.  Let me go back over some background

18   information.  So the first question I have is:  How old are

19   you, sir?

20       A    I'm 33 years, Your Honor.

21       Q    You're 33.  Okay.  You're tall.  Just pull it all

22   the way up so you don't have to lean over.

23           Okay.  And what is your date of birth?

24       A    16 September, 1984.

25       Q    Okay.  And how far have you gone in school?  What

1    is the highest educational level you received?

2         A    Master degree level.

3         Q    A Master's degree.  A Master's degree in what

4    subject?

5         A    Psychology.  It's the field of psychology.

6         Q    Okay.  And where were you born?

7         A    In Bucharest, Romania.

8         Q    Since you're not a U.S. citizen -- and I'm

9    assuming that you're not based on what's included in the

10   agreement about your being deportable and removable -- I

11   want to make sure that you understand the conviction can

12   result in your deportation, exclusion from the United

13   States, or denial of citizenship under our immigration laws,

14   and there are certain immigration consequences that are

15   discussed in the plea letter.

16        A    Yes.

17        Q    Do you understand that?

18        A    I understand that.

19        Q    And did you have an opportunity to talk to your

20   attorney about those consequences?

21        A    Yes, of course.  Yes.

22             THE COURT:  All right.  Mr. Carney, did you go

23   over specifically what the consequences, at least the ones

24   that are listed in the plea letter, there may be others as

25   well?

1          MR. CARNEY:  Yes, I did, Your Honor.

2     BY THE COURT:

3          Q    All right.  Have you taken any kind of drugs in

4     the last 48 hours or any kind of medication that might

5     affect your ability to understand what you're doing by

6     pleading guilty?

7          A    No, Your Honor, I didn't take any medication or

8     drugs.

9          Q    All right.  In terms of your ability to read and

10    write and understand -- in Romania, with a Master's degree,

11    I'm assuming you can read and write in Romania; is that

12    correct?

13         A    Yes, that's correct.

14         Q    And in English, what's your facility in terms of

15    reading and writing?

16         A    I can read and also write.

17         Q    Where did you learn your English?

18         A    By myself.

19         Q    So not in school?

20         A    No, not in school.

21         Q    Have you ever received any treatment for any type

22    of mental illness or emotional disturbance?

23         A    No.

24         Q    Now, do you have a copy of the indictment?  That's

25    the document that sets out what the charges are.

1    A    I think so.

2    Q    They're written, and I think you were --

3         MR. CARNEY:  Bear with me, Your Honor.  I think

4    the Government has a copy.

5    BY THE COURT:

6    Q    Okay.  And I understand you were arraigned in

7    front of them; in other words, you were told what the

8    charges were?

9    A    Yes, of course.

10   Q    Have you fully discussed the charges and the case

11   in general with your lawyer?

12   A    Yes.  I discussed with Mr. Carney.

13   Q    And have you actually read the indictment?

14   A    Yes, I also read it.

15   Q    All right.  Are you completely satisfied with the

16   services of your lawyer in this case?

17   A    Yes, I am.

18   Q    And have you had enough time to talk with your

19   attorney, discuss the case and the plea offer and whether

20   you should accept it or whether you should go to trial?

21   A    Yes, we had the chance to discuss.

22   Q    All right.  Let me go through your basic

23   constitutional rights that you're giving up by pleading

24   guilty, and it doesn't matter whether you're a citizen or

25   not, you would still have these rights.

1          The first is you have a right to plead not guilty

2      and have a jury trial in the case; that means that citizens

3      of the District of Columbia would be summoned to the

4      courtroom, they would be asked questions by me, your lawyer,

5      and the Government to determine whether or not they could be

6      fair and impartial in this case.

7          Once they were selected, there would be 12 -- they

8      would be making the decision, they would be in the jury box,

9      and they would listen to the evidence presented by the

10     Government and if you decided to put on a defense from you.

11     They would review the exhibits and the evidence.  They would

12     receive jury instructions.  They would apply the jury

13     instructions to the evidence, and those 12 citizens would

14     determine your guilt or innocence based on the evidence

15     presented in the courtroom.

16          Do you understand your right to a jury trial?

17     A    Yes, I understand.

18     Q    Do you understand if you went forward to trial,

19     you would have a right to be represented by a lawyer at the

20     trial, and if you could not afford one, one would be

21     appointed for you?

22     A    Yes, I also understand that.

23     Q    Do you understand that at a trial, you would have

24     the right, through your lawyer, to confront and

25     cross-examine any witnesses against you?

1    A    Yes, I understand also.

2    Q    Do you understand that you would have the right to

3 present your own witnesses and have a right to subpoena

4 them; in other words, to make them come to court to testify

5 in your defense?

6    A    Yes, I understand.

7    Q    Do you understand that if there were a trial, you

8 would have the right to testify and present evidence on your

9 own behalf if you wanted to, but that you wouldn't have to

10 testify or present any evidence if you didn't want to

11 because you cannot be forced to incriminate yourself; that

12 is, to present evidence of your own guilt.  And if you

13 decided not to testify, asserting your constitutional right,

14 the jury could be told that your failure to testify cannot

15 be held against you.  They can't infer any guilt from that

16 if you decide to assert your right.  Do you understand?

17    A    I understand.

18    Q    Do you understand that unless and until I accept

19 your guilty plea, you're presumed by the law to be innocent

20 because it's the Government's burden to prove your guilt

21 beyond a reasonable doubt, and until it does, you cannot be

22 convicted at trial?

23    A    Yes, I understand.

24    Q    Do you also understand that if you went to trial

25 and were convicted, you would have a right to appeal your

1    conviction to the Court of Appeals and have a lawyer help

2    you prepare your appeal?  Do you understand that?

3            A    I understand, Your Honor.

4            Q    Now, do you understand that by pleading guilty,

5    you're giving up all of your rights to appeal, but let me go

6    through one portion of it.  If you have your plea agreement

7    in front of you, if you would turn to page 8 and Section D.

8    Okay?

9            A    Okay.

10           Q    Now, in this one, you do retain the right to,

11   constitutional right, but you are giving up your statutory

12   rights.  So you always retain your constitutional rights to

13   appeal the sentence.  So if you believe your guilty plea was

14   somehow unlawful or involuntary, or there was some other

15   fundamental defect in the proceedings that was not provided

16   to you as part of the guilty plea proceeding, you can appeal

17   that.  However, the statutory provision -- and that's what's

18   in your plea agreement -- under certain circumstances, you

19   have statutory rights that you could assert.  In this case,

20   you've agreed to give them up.  Specifically, you're

21   agreeing to waive, which means give up, the right to appeal

22   the sentence including, but not limited to, the length of

23   the sentence, any fine, any forfeiture, any award of

24   restitution, any term or condition of supervised release,

25   and the authority of the Court to set conditions of release

and the manner in which the sentence was determined.  So
you're agreeing that you would not raise those issues on
appeal.

A    Yes.

Q    But if the sentence that I give you is above the
statutory minimum, which would be an illegal sentence, an
unlawful sentence, or above the guideline range determined
by the Court, in other words, I determined that, and I would
sentence you above that, or you claim that you received
ineffective assistance of counsel, in which case you would
have the right to appeal the illegal sentence or the
above-guideline sentence, or raise on appeal the claim of
ineffective assistance of counsel, but you couldn't raise on
appeal other issues regarding the sentencing.  Do you
understand that?

A    I understand that.

Q    Okay.  And is this something that you discussed
with your lawyer?

A    Yes, of course.

THE COURT:  Okay.  Mr. Carney, did you go over
specifically him giving up his appeal rights?

MR. CARNEY:  I did, Your Honor.

BY THE COURT:

Q    All right.  In terms of a notice of appeal, with
few exceptions, the notice has to be filed within 14 days of

1   judgment being entered.  If you're unable to pay the cost of

2   an appeal, you can apply to file it without cost to you.

3          Also, I want to make sure you understand, if you

4   plead guilty, and I accept your guilty plea, you'll be

5   giving up all the rights that I've just explained to you,

6   all of those rights connected to the trial rights as well as

7   those limited in terms of the appeal.  Do you understand

8   that?

9       A    Yes, I understand.

10      Q    Do you want to plead guilty in this case, give up

11  your rights associated with a trial, your right to an appeal

12  as I've explained it, and all of the other rights that I've

13  just discussed with you?

14         You have to say something orally.

15      A    Yes.

16      Q    Okay.  All right.  The next part of this is going

17  to be relating to the statement of offense.

18         So as I explained to you -- and I'll now put it on

19  the record and make sure we have it under oath -- there are

20  two statements of offense, and the only difference between

21  them is that in one, three of the co-conspirators are not

22  identified by name.  They're given C7, C10, C22.  In the

23  other one, the names are actually provided, and my

24  understanding is you signed both statement of offenses; is

25  that correct?

1    A    That's correct.

2    Q    In looking at the one where the statement actually

3    has the names in there, are you agreeing that C -- the real

4    person who is C22, the real person who is C10, and the real

5    person who is C7, they've correctly set out what their role

6    and actions are?

7    A    Yes, they are.

8    Q    Okay.  Then what I'm going to go through is -- and

9    I will use, you know, the C22, but as I understand it, you

10   know who they are; is that correct?

11   A    Yes, it's correct.

12   Q    Okay.  Now, the Government is going to state the

13   evidence that would've been presented if the case had gone

14   to trial, and the Court needs to find that the evidence

15   they've presented matches the elements of the offense with

16   which you're pleading guilty to in order for me to find that

17   you're guilty.  So they're going to state the offense, which

18   is probably from the statement of offense, to a large

19   degree.  They will match up the elements of the offense with

20   the evidence that's been presented to indicate to me, and I

21   need to be able to find that there's evidence on each of the

22   elements in order to find you guilty.

23        I will go through all of that, and if that's a

24   defense that would've been raised, we'll go over that to

25   make sure you understand that by pleading guilty, you're not

```
1    going to be able to raise this defense.

2         A    Right.  Yes.

3         Q    And we'll go through and make sure that what's in

4    the statement of offense you're agreeing to.

5              Now, there may be some things that you're not

6    aware of that the Government has as evidence, and if that's

7    the case, then let me know that.

8         A    Okay.

9         Q    I'm going to assume, unless you bring that up when

10   I start asking the inquiry, that you would've known that at

11   the time.  Okay?

12        A    Okay.

13        Q    So you can go ahead and sit down and have the

14   statement of offense out, and we'll go over it.

15             MR. MARANDO:  Thank you, Your Honor.

16             Had this matter proceeded to trial, the Government

17   would have proven the following beyond a reasonable doubt:

18   Defendant Cristian Flamanzeanu, also referred to as

19   Cristiano Flamanzeanu, was a resident and citizen of

20   Romania.

21             Co-conspirator 10, co-conspirator Daniel Alexandru

22   Ciomag, co-conspirator 22, residents and citizens of

23   Romania.  Co-conspirator Sabina Selimovic was a resident of

24   Germany and a citizen of Serbia.  Co-conspirator Harry Meir

25   Mimoun Amar were residents and citizens of Israel.
```

1          THE COURT:  What about Segal and some of these

2     others?  Not mentioning everybody.

3          MR. MARANDO:  We provided the Court with a revised

4     version omitting those individuals, Your Honor.

5          THE COURT:  Okay.  I must not have gotten it,

6     then.  Yes, but in advance.

7          Okay.  Did you change -- I should've asked at the

8     beginning:  Did you change other things?

9          MR. MARANDO:  Well, we removed references to those

10    individuals, Your Honor.  They were inadvertently put in

11    there by mistake.

12         THE COURT:  Okay.  So which one should not be

13    here?

14         MR. MARANDO:  CC14.

15         THE COURT:  Well, I don't have it that way.  I've

16    got your statement of offense.  So paragraph 2 has Rozesku.

17    That's out?

18         MR. MARANDO:  Probably the easiest way to do this

19    is to give Your Honor the signed copy that the parties

20    signed.

21         THE COURT:  Okay.  It would've been helpful for

22    you to let me know this because I mark these up.

23         MR. MARANDO:  I apologize, Your Honor.  I

24    sincerely I apologize.  We caught a couple mistakes.  In

25    fact, CC14, whose name was just mentioned on the record, is

1    actually in a matter under seal, Your Honor.  That was why

2    it was taken out.

3             THE COURT:  All right.  So what else is out?

4             MR. MARANDO:  References to CC14 is out.  There

5    was one mention of CC10 by name that was taken out.  There

6    was another reference to a co-conspirator from Bethesda,

7    Maryland, that was in paragraph 6 of the version that you

8    marked up, Your Honor.  That was taken out.  He was

9    irrelevant to the statement of offense.  Other than that,

10   there were no changes.

11            THE COURT:  All right.  Well, then, what we have

12   is Flamanzeanu.  In paragraph 2 we have CC10.  We then

13   have --

14            MR. MARANDO:  Daniel Alexandru Ciomag.

15            THE COURT:  Okay.  This is the unredacted one.

16   Okay.  Hold on.

17            All right.  So CC10.  Ciomag.

18            MR. MARANDO:  22.

19            THE COURT:  22.

20            MR. MARANDO:  Selimovic.

21            THE COURT:  Okay.

22            MR. MARANDO:  Then we have -- our paragraph 4 is

23   Amar.

24            THE COURT:  All right.

25            MR. MARANDO:  Paragraph 5 is CC7.

1          THE COURT:  Right.

2          MR. MARANDO:  And those are the individuals that

3    are at issue in this, Your Honor.

4          THE COURT:  All right.

5          MR. MARANDO:  And, again, Your Honor, I apologize

6    for this.

7          THE COURT:  So another citizen of Hungary is out,

8    I take it.

9          Okay.  So let me just look through here a minute.

10         Okay.  Go ahead.

11         MR. MARANDO:  Okay.  So starting at paragraph 6,

12    Your Honor, which involves the conspiracy to commit the

13    Business Email Compromise scheme.

14         From in or around April of 2014 through in or

15    around March of 2015, within the District of Columbia and

16    elsewhere, Defendant Flamanzeanu, together with other

17    co-conspirators, did knowingly and intentionally conspire,

18    combine, confederate, and agree to --

19         THE COURT:  You need to slow down.

20         MR. MARANDO:  -- to devise a scheme and artifice

21    to defraud and to obtain money and property by means of

22    false and fraudulent pretenses, representations, and

23    promises, and for the purpose of executing and attempting to

24    execute the scheme and artifice to transmit and cause to be

25    transmitted in interstate and foreign commerce by means of a

wire communication certain writings, signs, signals, and
sounds, in violation of Title 18 U.S.C. § 1343, which is the
wire fraud statute.

Now I'll provide some background on the Business
Email Compromise scheme and what it was.

Beginning in or around April 2014 and continuing
through in or around March of 2015, Defendant Flamanzeanu,
together with other co-conspirators, executed an
international cyber enabled fraud scheme, commonly referred
to as a Business Email Compromise, or BEC scheme.  We'll be
referring to it as the BEC scheme going forward.

It was part of that scheme that Flamanzeanu,
together with his co-conspirators, deceived mid-level
employees of target companies who maintained access to and
control over the target company's bank accounts convincing
those employees to transfer large sums of money to bank
accounts opened and controlled by other co-conspirators.

In executing the BEC scheme, Flamanzeanu, together
with his co-conspirators, targeted mid-sized and large
companies through spoofed emails, and those are emails that
are purported to come from someone else by the
co-conspirators.  They were impersonating executive level
employees of the companies such as the president or chief
executive officer of a company.

Once an employee of a target company had been

1    hooked by a co-conspirator, the company employee was led to

2    believe that they were being entrusted to handle a large

3    financial transaction such as a secret corporate

4    acquisition.  The employee was then instructed by the

5    co-conspirators to initiate wire transfers from the

6    company's corporate bank accounts to bank accounts

7    controlled by members of the criminal enterprise to pay for

8    the alleged corporate acquisition.  To fraudulently induce

9    the employee to initiate the wire transfer of money, the

10    co-conspirators created fake nondisclosure agreements

11    appearing to come from the European Securities Market

12    Authority, otherwise known as ESMA, E-S-M-A.

13        The ESMA nondisclosure agreements were sent by the

14    co-conspirators through email to the mid-level employees of

15    the victim companies.  The co-conspirators then instructed

16    the mid-level employees to execute the agreements because

17    the purported corporate transaction was highly confidential

18    and could not be shared with anyone.

19        The nondisclosure agreements, however, needed to

20    be signed by the actual high-ranking corporate official at

21    the victim company who were being impersonated by the

22    co-conspirators; thus the co-conspirators would find the

23    high-ranking officials' signatures on publicly filed

24    documents and through Internet databases, and would copy

25    those signatures onto the phony contracts.

1        The co-conspirators would also contact the

2    mid-level employees of the victim companies by telephone

3    posing as outside counsel assisting the high-ranking

4    corporate official in the phony corporate transaction.

5        To add to the supposed legitimacy of the

6    transaction, the co-conspirators would also create fake

7    websites for the attorneys and would manipulate Google

8    search engine results to insure that if the employees ever

9    attempted to look up the purported outside counsel, the

10   employees would find the fraudulent attorney's website.

11       Once the co-conspirators successfully persuaded

12   the employees of the victim companies to transfer money to

13   the co-conspirators' bank accounts, the funds were quickly

14   then wire transferred out of reach of the victim company by

15   members of the conspiracy and into bank accounts located in

16   the People's Republic of China and elsewhere with the funds

17   ultimately being delivered to co-conspirators located in

18   Europe and elsewhere.

19       THE COURT:  Okay.  You're starting to speed up for

20   the court reporter.

21       MR. MARANDO:  I'm sorry.  Am I going too fast?

22       THE COURT:  We'll provide the court reporter, if

23   we haven't already, with a copy.  But go ahead.

24       MR. MARANDO:  Now I'm going to discuss the

25   technical aspects of the BEC scheme.

1              The co-conspirators created the spoofed emails by

2     using a fee-based Internet database to learn which employees

3     of the target companies likely had the authority to transfer

4     large sums of money to external bank accounts.   The

5     co-conspirators also used those databases to learn the email

6     addresses for the presidents, CEOs, and CFOs of the target

7     companies.

8              The co-conspirators then purchased domain names

9     from a United States based domain name register.   They would

10    purchase domain names that closely mimic the actual domain

11    names of the victim companies in order to trick the

12    companies' employees into believing that the emails the

13    co-conspirators sent from the fraudulent domain names were

14    actually being sent from an executive level employee of the

15    target company.

16             The co-conspirators chose to purchase the domain

17    names from this United States based registrar because,

18    first, this registrar accepted payment in the payment of

19    Bitcoin, which is a virtually untraceable electronic fiat

20    currency.   And, secondly, the registrar offered services

21    which anonymized the creator of the domain name thereby

22    preventing others from determining who, in fact, truly

23    created that domain name.

24             To purchase the domain names from this registrar,

25    the co-conspirators initiated the transfer of Bitcoin

1    through the Internet to the domain name registrars' servers

2    located in the United States.

3            Once the co-conspirators purchased the domain

4    names, they then used Mozilla Thunderbird, which is an email

5    program to make the domain names appear identical to the

6    victim companies' actual domain names.  The co-conspirators

7    then sent their spoofed emails to the target companies by

8    reconfiguring the Simple Mail Transfer Protocol settings in

9    Mozilla Thunderbird to utilize the servers of well-known

10   email providers in the United States to insure that their

11   fraudulent emails actually reached the employees of the

12   target companies and were not stopped by those companies'

13   spam folders.

14           The co-conspirators also purchased domain names

15   from the same United States based domain name registrar to

16   create the websites for fictitious outside counsel that were

17   purportedly working on the transaction, and that, when

18   viewed by the employees of the target companies, would

19   backstop the co-conspirators' fraudulent representations.

20           In addition, the co-conspirators communicated

21   through electronic means such by text messages and online

22   chat communications through United States based messaging

23   applications such as WhatsApp and Wickr.

24           The co-conspirators, which included Flamanzeanu,

25   executed the BEC scheme out of a base of operations, also

known as safe houses, which they periodically moved from
country to country.

The co-conspirators maintained the safe houses in
different countries from those in which the target companies
were located and from those in which the bank accounts
receiving monetary transfers of criminal proceeds were
opened.

The co-conspirators used virtual private networks,
which is technology that allowed them to hack into and root
Internet traffic through WiFi networks in the vicinity of
the safe houses a voice changing software and other
technical exploitations in order to avoid detection by law
enforcement and the target corporations.

Now I'm going to discuss Mr. Flamanzeanu's role in
the BEC scheme.

Mr. Flamanzeanu is a skilled graphic designer with
prior experience using design programs such as Microsoft
Photoshop.

Flamanzeanu's primary role in the BEC scheme was
to use his design skills to assist in copying the signatures
of the high-ranking corporate officials onto the fraudulent
ESMA nondisclosure agreements that were sent to the
mid-level employees of the target companies.

Flamanzeanu also assisted in creating variations
of the high-ranking officials' signatures to make them

1    appear more authenticate.

2           In addition, Flamanzeanu used his design skills to

3    assist in the creation of the spoofed emails by inserting

4    corporate logos into those emails thereby making those

5    emails appear legitimate to the recipient.

6           When the BEC scheme began in 2014, Mr. Flamanzeanu

7    was working as the art director for a company in Bucharest,

8    Romania, that developed games and applications, also known

9    as apps, for mobile telephones.

10          Flamanzeanu's employer was an acquaintance of

11   co-conspirator Ciomag.  Flamanzeanu hoped to some day

12   develop his own games and apps for mobile telephones and was

13   seeking funding for that purpose.

14          Now I'm going to discuss Flamanzeanu's execution

15   of the BEC scheme.

16          In or around May of 2014, Flamanzeanu was sent to

17   Antalya, Turkey, by his employer under the false pretense

18   that he would use his design skills to assist others in

19   cleaning up confidential corporate documents.

20          For his efforts, Flamanzeanu's employer agreed to

21   pay Flamanzeanu approximately 3,000 euro per month.

22          Flamanzeanu was unaware at the time that he was

23   going to be involved in the BEC scheme.

24          THE COURT:  So the employer was the employer that

25   employed him as the art director, or the other --

1          MR. MARANDO:  He was the owner of the company that

2     employed Mr. Flamanzeanu as the art director.

3          THE COURT:  Okay.

4          MR. MARANDO:  When Flamanzeanu arrived at the safe

5     house in Turkey, Ciomag, CC10, and CC22 were already

6     present.

7          Over the next few weeks, Flamanzeanu stayed in a

8     room separate from Ciomag and CC10, and Ciomag provided

9     Flamanzeanu with USB flash drives containing signatures that

10    needed to be cleaned up or remade.

11         Flamanzeanu then used his design skills to make

12    those signatures appear less pixilated and thereby more

13    authentic in return to those cleaned up signatures to Ciomag

14    on the same USB flash drive.

15         After working for a couple of weeks in the safe

16    house, Flamanzeanu realized that he was engaged in a

17    fraudulent scheme to defraud corporate entities of their

18    money, but he did not understand the full details and scope

19    of that fraud scheme.

20         On or about June 18th, 2014, CC10, Ciomag, CC22,

21    and Flamanzeanu fraudulently caused a Spanish company,

22    herein designated as Victim 9, to wire transfer 283,400 euro

23    to a bank account in Hungary provided by CC7.

24         Following the successful fraud attack, the

25    co-conspirators, including Flamanzeanu, left Turkey due to

1  Visa restrictions.  Flamanzeanu then returned home to

2  Romania.

3         Before leaving Romania, however, Ciomag provided

4  Flamanzeanu with a cellular phone and instructed Flamanzeanu

5  to keep that phone powered on.  Ciomag eventually called

6  Flamanzeanu and asked Flamanzeanu to join the

7  co-conspirators in their new safe house in Varna, Bulgaria.

8         At the time, Flamanzeanu was still interested in

9  developing a mobile application and needed funding.  Ciomag

10  and CC10 promised to provide Flamanzeanu with 30,000 euros,

11  which is approximately 40,000 U.S. dollars, in funding for

12  his app if he remained in the conspiracy.

13         Flamanzeanu then decided to join the conspirators

14  in Bulgaria in or about June of 2014.

15         In Bulgaria, Flamanzeanu continued to clean up the

16  signatures of the high-ranking corporate officials that were

17  used in the fraudulent contracts for the BEC scheme.  He

18  also worked on the corporate logos that were inserted into

19  the fraudulent emails that were sent to the employees at the

20  victim companies.  The initial members of the conspiracy in

21  Bulgaria were CC10, Ciomag, CC22, and Flamanzeanu.

22         In or around July of 2014, co-conspirators Amar

23  and Selimovic traveled to Bulgaria to join the conspiracy

24  with CC10, Ciomag, CC22, and Flamanzeanu.

25         The co-conspirators then decided to target German

companies, among others, because Selimovic was fluent in

German and professed to have success in executing similar

BEC schemes in Israel.

Selimovic talked to victim companies on the phone

posing as the lawyer, and Amar assisted the co-conspirators,

among other things, in composing the fraudulent emails to

the victim companies.

Following the arrival of Amar and Selimovic,

Flamanzeanu began to understand in greater detail how the

BEC scheme operated such that the scheme involved defrauding

companies through emails.

In the Bulgarian safe house, Flamanzeanu began to

receive the full corporate documents with signatures from

Ciomag to work on rather than just the signatures of the

corporate officials and manipulated those corporate

documents to facilitate the BEC scheme.

In or around July of 2014 through in or around

August 2014, while the safe house was in Bulgaria,

co-conspirators Amar, Selimovic, CC10, Ciomag, CC22, and

Flamanzeanu, through false representations, caused a German

company, herein designated as Victim 6, to wire transfer

approximately 550,000 euro to a bank account controlled by

the co-conspirators.

On or about August 7th, 2014, Defendant

Flamanzeanu and his co-conspirators caused a Finish company,

herein designated as Victim 10, to attempt to wire transfer
383,400 euro from the company's bank account to a bank
account in Hungary provided by CC7.  The transaction,
however, was able to be reversed, and the funds were
returned to the victim.

In or around August and September of 2014, CC10,
Ciomag, Selimovic, Amar, CC22, and Flamanzeanu caused a
company in Portugal, herein designated as Victim 5, to wire
transfer approximately $380,000 to a bank account in China.

In September of 2014, the co-conspirators left the
safe house in Bulgaria.  Flamanzeanu returned home to
Romania and was told again by Ciomag to keep the cell phone
Ciomag gave him turned on.

While Flamanzeanu was in Romania, Ciomag contacted
Flamanzeanu again and informed Flamanzeanu that he was
needed in the conspirators' new safe house in Prague, Czech
Republic.

Flamanzeanu then traveled to Prague, again under
the belief that Ciomag would provide the funding necessary
for Flamanzeanu to develop his mobile gaming application.

In or around October or November of 2014, CC10,
Ciomag, Selimovic, CC22, and Flamanzeanu began operating the
BEC scheme from their safe house in Prague.  From this
location, Flamanzeanu continued to work on the forged
significant used in the fraudulent contracts and worked on

the corporate logos inserted in the fraudulent emails.

On or about November 10th of 2014, Defendant Flamanzeanu and his co-conspirators, through false representations concerning a purported corporate acquisition, caused an accountant employed at a company located in Germany, herein designated as Victim 1, to wire transfer approximately 570,000 euro from a bank account in Germany to a bank account in Hungary.

On or about November 12th of 2014, based on continuing false representations concerning the purported corporate acquisition, Victim 1 wire transferred an additional amount of approximately 570,000 euro from a bank account in Germany to the bank account in Hungary.

On or about November 17th, 2014, based on continuing false representations concerning a purported corporate acquisition, Victim 1 wire transferred an additional amount of approximately 855,000 euro from a bank account in Germany to the bank account in Hungary.

On or about November 18th, 2014, based on continuing false representations concerning a purported corporate acquisition, Victim 1 was directed to wire an additional amount of approximately 1,564,080 euros from a bank account in Germany to the bank account in Hungary.  On or about November 18th, 2014, Victim 1 discovered the scheme and did not initiate the additional wire transfer of

1   this 1,564,080 euro.

2        On or about November 26th, 2014, CC10, Ciomag,

3   Selimovic, CC22, and Flamanzeanu, through false

4   representations concerning a purported corporate

5   acquisition, caused an employee in the accounting department

6   at a company located in Germany, herein designated as

7   Victim 4, to wire transfer approximately 570,000 euro from a

8   bank account in Germany to a bank account in Hungary.  CC10

9   obtained the bank account information for the account in

10  Hungary from CC7.

11       On or about November 28th, 2014, based on

12  continuing false representations, Victim 1 wire transferred

13  an additional --

14       THE COURT:  You mean Victim 4?

15       MR. MARANDO:  I'm sorry.  Victim 4, Your Honor,

16  wire transferred an additional 850,000 euro from a bank

17  account in Germany to the bank account in Hungary.

18       On or about December 2nd, 2014, based on

19  continuing false representations, Victim 4 wire transferred

20  an additional 850,000 euro from a bank account in Germany to

21  the bank account in Hungary.

22       On or about December 2nd, 2014, based on

23  continuing false representations, Victim 4 wire transferred

24  an additional 850,000 euro from a bank account in Germany to

25  the bank account in Hungary.

On or about December 3rd, 2014, based on
continuing false representations, Victim 4 wire transferred
an additional 1.7 million euro from a bank account in
Germany to the bank account in Hungary.

On or about December 9th, 2014, based on
continuing false representations, Defendant Flamanzeanu,
together with others, caused Victim 4 to wire transfer
1.1 million euro from a bank account in Germany to a bank
account in China provided to Defendant CC10 by CC7.

The co-conspirators eventually left Prague, and
Flamanzeanu returned home to Romania.  Again, while in
Romania, Flamanzeanu was instructed by Ciomag to keep the
cellular phone given to him turned on by Ciomag.

Eventually, Flamanzeanu received a call from
Ciomag telling Flamanzeanu that his assistance was needed at
the conspirators new safe house in Warsaw, Poland.
Flamanzeanu, believing that his continued assistance in the
BEC scheme would result in Ciomag funding the development of
his application, traveled to Warsaw.  The co-conspirators
operating in the Warsaw safe house consisted of CC10,
Ciomag, Selimovic, and Flamanzeanu.  Despite repeated
attempts, they were not successful in defrauding any
companies while there.  The co-conspirators eventually left
Warsaw and relocated to their final safe house in
Bratislava, Slovakia.  The group in Bratislava consisted of

CC10, Ciomag, Selimovic, and Flamanzeanu.

On or about March 5th, 2015, CC10, Ciomag,
Selimovic, and Flamanzeanu, through false representations
concerning a purported corporate acquisition, caused a
German company, herein designated as Victim 2, to wire
transfer 570,000 euro from a bank account in Germany to a
bank account in Poland provided to CC10 by CC7.

On or about March 10th, 2015, CC10, Ciomag,
Selimovic, and Flamanzeanu, through false representations
concerning a purported corporate acquisition, caused a
German company, herein designated as Victim 3, to attempt a
wire transfer of 750,000 euro from a bank account in Germany
to a bank account in Hungary provided to CC10 by CC7.
Victim 3, however, was able to terminate the wire
transaction.

While in the safe house in Bratislava,
law enforcement arrested CC10.  Ciomag and Flamanzeanu fled
the location.

Flamanzeanu had no contact with any of the
aforementioned co-conspirators since that time.  Flamanzeanu
also never received any funding for the mobile phone
application that he was developing.

This proffer of evidence, Your Honor, is not
intended to constitute a complete statement of all the facts
known by the defendant or the Government but is merely a

1    minimum statement of facts intended to provide the necessary

2    factual predicate for the guilty plea.

3            As to the other named defendants and the charges

4    in the superseding indictment, Your Honor, the defendant has

5    told us that he will admit that the allegations in the

6    indictment are true, or that he does not have information to

7    dispute or disprove those allegations set forth in the

8    superseding indictment in any way.

9            THE COURT:  All right.  If you could then hook

10   this up to the elements of the offense.

11           MR. MARANDO:  Sure, Your Honor.

12           So I'll first start with the elements of

13   conspiracy to commit wire fraud as I set them forth in the

14   plea checklist that was provided to Your Honor and the

15   defendant.

16           The first element of conspiracy to commit wire

17   fraud, in violation of 18 U.S.C. § 1349, is that the

18   defendant entered into an agreement with at least one other

19   person to commit the offenses of wire fraud.

20           Your Honor, I would respectfully refer the Court

21   to paragraphs 6 through 9.  Paragraph 6 is a general

22   paragraph that lays out defendants knowing and intentional

23   agreement to conspire with other co-conspirators, to defraud

24   and obtain money by means of false and fraudulent pretenses.

25   And that as part of that conspiracy, writings, signs,

1    signals, and sounds were transmitted in interstate and

2    foreign commerce for the purpose of executing that scheme.

3           Paragraphs 7, 8, 9, Your Honor, actually all the

4    way through to 13, discuss how the United States wires were

5    used entirely to complete the scheme, Your Honor.  It also

6    talks about Mr. Flamanzeanu's -- in each paragraph talks

7    about Mr. Flamanzeanu's agreement to conspire with his

8    fellow co-conspirators in order to defraud companies in that

9    United States wires were used at all times in order to

10   defraud those companies.

11          THE COURT:  All right.  So the knowingly is just

12   that he -- it's not by mistake.  It has some other meaning

13   as I understand it.

14          MR. MARANDO:  No.

15          THE COURT:  All right.  And what's the specific

16   overt act you're looking at?

17          MR. MARANDO:  The specific overt acts, Your Honor,

18   there are many of them in here.  All of the overt acts,

19   Your Honor, as I've described in the statement of offense,

20   involve Mr. Flamanzeanu's use of his design skills to create

21   the corporate logos that were in each email.

22          So as it's stated in the statement of offense,

23   when a victim company got an email, there were corporate

24   logos that were inserted in them to make the emails look

25   like they were legitimately coming from a CEO of a company,

1    for instance.

2              In each of the attacks that occurred in here,

3    Your Honor, that occurred, and Mr. Flamanzeanu took that act

4    to insert those corporate logos in there and used his design

5    skills to copy those logos in the emails.  But, more

6    importantly, for each of the victims that I discussed here

7    in the statement of offense, there were fraudulent corporate

8    contracts and agreements that were sent to the victim

9    companies to make the person receiving those contracts

10   believe that they were actually involved in facilitating a

11   legitimate corporate transaction.

12             Now, what Mr. Flamanzeanu would do, and his acts

13   were in those regards, was to basically copy or forge the

14   signature of the high-ranking corporate official and insert

15   that signature into the corporate agreements where the CEO,

16   for instance, would sign off, and it would appear as if the

17   agreement was actually signed by the CEO.

18             THE COURT:  All right.  And in terms of the

19   interstate or international wire communications, is it the

20   emails?

21             MR. MARANDO:  Yes, Your Honor.  It's multifaceted,

22   actually.

23             So when the conspirators sent these emails, they

24   first had to purchase a domain name, and they would purchase

25   a domain name -- and if Your Honor is familiar with the term

1    "domain name"?

2         THE COURT:  Yes.

3         MR. MARANDO:  They would purchase a domain name

4    that looked almost identical to the domain name of the

5    company that they were defrauding.  They would purchase that

6    from one specific domain name provider here in the United

7    States, which we did not mention by name in here in the

8    statement of offense, but they were located in the United

9    States.  They would purchase those by sending Bitcoin from

10   their locations to the United States.  It would hit -- the

11   company's servers were located in the United States, and

12   then all emails, subsequent emails, would be utilizing that

13   domain name in the United States.

14        In addition, what they would do is they would take

15   those domain names, and they would create fake websites; so

16   a fake website for the attorney that Selimovic actually was

17   posing as.  So if the victim employee wanted to look up and

18   see if this attorney was real, they would look up and find a

19   fake website.  That website would've been housed on a server

20   located here in the United States.

21        Then all of the emails that were sent to all of

22   the victims here would go through that domain name provider

23   in the United States.  Then they would take the additional

24   step of then rerouting those emails one more time through

25   another email provider located here in the United States,

```
 1     which there are actually a couple of them that they
 2     utilized, which we did not name by name here.  But they
 3     would do that because those were trusted email providers
 4     that I'm sure Your Honor has heard of if I were to say them.
 5     But they would route them through those company servers in
 6     the United States because the victim company's spam filters
 7     would be less likely to stop them, and their intended
 8     fraudulent emails would actually hit their target employees
 9     and would not get caught in the employees' spam folder.
10               So every single communication here was facilitated
11     by the use of interstate and wires to the United States.
12               THE COURT:  Interstate or international?
13               MR. MARANDO:  International.
14               THE COURT:  All right.  If Mr. Flamanzeanu would
15     please come up.
16     BY THE COURT:
17          Q    All right.  Mr. Flamanzeanu, let me just ask you
18     in general:  Do you agree with what has been stated in here?
19          A    Yes.
20          Q    Anything you don't agree with or don't think is
21     quite accurate?
22          A    No, the date is accurate.
23          Q    All right.  So if you have it in front of you, it
24     will make it easier for us to go through it.
25          A    Yes.
```

1    Q    So the first part just sets out who the

2   co-conspirators were; some identified by names and some are

3   by CC7, 10, and 22.

4        So you would view those -- these were the people

5   that were your co-conspirators in terms of the scheme; is

6   that correct?

7    A    Yes, that's correct.

8    Q    All right.  And then the next paragraph gets into

9   the scheme, which was to obtain money by -- they set up this

10  fraud scheme in terms of targeting particular companies and

11  deceiving mid-level employees of these target companies, and

12  these mid-level employees had control over the companies'

13  bank accounts.  And they would convince them to transfer

14  sums of money to bank accounts that were controlled by the

15  other co-conspirators, and the co-conspirators would

16  impersonate the executive level employees such as the

17  president and the chief executive officer, who would've had

18  to have signed these agreements, these nondisclosure

19  agreements from the European Securities and Markets

20  Authority such that the employees who had been contacted or

21  hooked would keep this information and not disclose it

22  generally.

23       That agreement was sent, and the co-conspirators

24  would use the signatures on these documents so they would

25  appear that they actually signed them.

```
1                    Am I correct, so far?

2         A     Yes, that's correct.

3         Q     All right.  And the employees of these companies

4    would then transfer money to other bank accounts controlled

5    by the co-conspirators; is that correct?

6         A     Yes, that's correct.

7         Q     And they then also had an attorney who would give

8    them some legitimacy, and they set up various websites and

9    other matters so that if the employees tried to check, it

10   would appear that this attorney was legitimate; is that

11   correct?

12        A     Yes, that's correct.

13        Q     So let me get into a little bit more specific.

14   They would contact the mid-level employees, the victim, by

15   phone, posed as outside counsel, you know, assisting the

16   corporate official in whatever these transactions are; is

17   that correct?

18        A     Yes.

19        Q     All right.  And the technical aspects, they

20   created the spoofed emails using a fee-based Internet

21   database in order to figure out who it is that they should

22   target getting the email addresses of the high officials of

23   the target companies.  They purchased domain names from a

24   U.S. based domain name registrar using names that closely

25   mimicked to the victim companies in order to trick the
```

1    companies' employees in believing that they were actually

2    communicating with their own employees as opposed to the

3    co-conspirators.  And it indicates why they chose the domain

4    names from the U.S. based registrar.

5              They would be paid in Bitcoin, which is not

6    traceable.  And the registrar offered services, which

7    anonymized the creator so they wouldn't be able to be

8    traced; is that correct?

9         A    Yes.

10        Q    And once they had the domain names, they then used

11   Mozilla Thunderbird, an email program, to make the domain

12   names appear identical to the victim companies, and then

13   they would reconfigure them and send them to the target

14   companies; is that correct?

15        A    Yes.

16        Q    And then they also created websites for the

17   fictitious outside counsel that were supposedly working on

18   it; is that correct?

19        A    Yes.  Yes, Your Honor.

20        Q    Okay.  I'm sure I made it much simpler than it is,

21   but that's generally the scheme that was used.

22             And I understand that they had safe houses, and

23   that you went to the safe houses when you were contacted; is

24   that correct?

25        A    Yes, that's correct.

1    Q    So the BEC scheme, which is what the scheme seems

2    to be called, you would go to safe houses, move from country

3    to country, and there they would target the company and the

4    bank accounts and receive the monetary transfers that would

5    then be put into bank accounts controlled by the

6    co-conspirators; is that correct?

7    A    Yes.

8    Q    All right.  Let's get to specifically what your

9    role was.  It sounds like it was a gradual thing; that you

10   didn't come in at the beginning knowing the full scheme;

11   that you gradually learned what it was, but you never

12   withdrew from it; is that correct?

13   A    Yes.

14   Q    So you're a skilled graphic designer with prior

15   experience using design programs such as Microsoft

16   Photoshop; is that correct?

17   A    Yes, that's correct, Your Honor.

18   Q    So you assisted in creating variations of the CEOs

19   or presidents of various companies in terms of their

20   signatures on the ESMA nondisclosure agreements that were

21   then sent to the mid-level employees so they thought that

22   their higher-up officials in the companies were actually

23   approving this; is that correct?

24   A    Yes, that's correct.

25   Q    And you also inserted the corporate logos into

1    those emails, is that correct, using your skills?

2        A    I worked on the logos.

3        Q    You worked on them?

4        A    There was another person inserting them or using

5    them for the emails.  But I worked on them, yes.

6        Q    Okay.  And you had been working, before you got

7    involved for the company, as an art director in Bucharest,

8    Romania; is that correct?

9        A    Yes.

10       Q    And you were interested in developing games and

11   applications for a mobile telephone; is that right?

12       A    Yes, Your Honor.

13       Q    Okay.  And the person you were working for was an

14   acquaintance of one of the co-conspirators, Ciomag; is that

15   correct?

16       A    Yes, that's correct.

17       Q    And so the employer at the time sent you to Turkey

18   under the false pretenses that you were going to use your

19   design to assist cleaning up confidential corporate

20   documents?

21       A    Yes.

22       Q    That's why initially you thought you were going;

23   is that correct?

24       A    That's correct, Your Honor.

25       Q    And your employer agreed to pay you approximately

1    3,000 euros per month.  And you, at that point, were not

2    aware that you were being involved in the BEC scheme; is

3    that correct?

4         A    Yes, that's correct.

5         Q    Now, when you arrived at the safe house in Turkey,

6    there were other co-conspirators that were already present,

7    and you stayed there.  You were not with Ciomag and CC10.

8    You were provided flash drives having the signatures that

9    needed to be cleaned up, and you used your design skills to

10   do this; is that correct?

11        A    Yes, that's correct.

12        Q    And after a while, you realized that you were

13   involved in a fraudulent scheme to defraud these corporate

14   entities; is that correct?

15        A    Yes, that's correct, Your Honor.

16        Q    But you weren't sure of all of the details, right?

17        A    Yes.

18        Q    Okay.  And then around June 18th of 2014,

19   co-conspirators CC10, CC22, Ciomag, and you fraudulently

20   caused a Spanish company -- we'll call them Victim 9 -- to

21   wire transfer 283,400 euros to a bank account in Hungary

22   that would've been provided by co-conspirator CC7.  And that

23   fraud attack was successful, and you left Turkey and

24   returned to Romania; is that correct?

25        A    Yes, that's correct.

1   Q    And then before you left Romania initially, Ciomag

2   had provided you with a cellular phone and had suggested

3   that you keep it powered on so he could contact you; is that

4   correct?

5   A    Yes, that's correct.

6   Q    And you were eventually contacted and sent to a

7   new safe house in Varna, Bulgaria; is that right?

8   A    Yes.

9   Q    And you were still interested in developing your

10  mobile application and needed funding, so you decided to

11  participate in the scheme; is that right?

12  A    Yes.

13  Q    So you and some other co-conspirators -- or others

14  had promised to give you approximately $40,000 in funding to

15  develop your app, though ultimately they never gave it to

16  you, I take it?

17  A    Exactly.

18  Q    They didn't give it to you?

19  A    No.

20  Q    All right.  And so you decided to join the

21  co-conspirators in Bulgaria in June of 2014, right?

22  A    Yes, exactly.

23  Q    And in Bulgaria, you continued to clean up the

24  signatures of the high-ranking officials that were being

25  used on the fraudulent contracts.  You also worked on the

1    corporate logos that somebody else inserted into the

2    fraudulent emails.  So that was predominantly your role; is

3    that correct?

4         A    Yes.

5         Q    But you knew what they were doing?  They were

6    defrauding other companies; is that correct?

7         A    Yes.

8         Q    And they were using your work to do this?

9         A    Yes.  The only thing I didn't know was exactly the

10   money that they were dealing with in all of this, but I was

11   aware that it was --

12        Q    So you didn't know how much they were actually

13   defrauding the companies, but you knew they were defrauding

14   the companies of money?

15        A    Yes.

16        Q    Okay.  And then in July of 2014, you and other

17   co-conspirators decided to target certain German companies.

18   One of the co-conspirators, Selimovic, posed as a lawyer, or

19   assisted the co-conspirators in composing these fraudulent

20   emails, and you began to understand in greater detail how

21   this scheme operated in terms of defrauding the companies

22   through the emails.  Then you began to get, not just the

23   signatures, but the full corporate documents with the

24   signatures that he wanted you to work on; is that correct?

25        A    Yes.

1    Q    And so you were able to manipulate those corporate

2    documents to facilitate the scheme; is that also correct?

3    A    Yes.  These were the documents that they were

4    providing me so I can see the signatures and to work on

5    them.

6    Q    All right.

7    A    Yes.

8    Q    And then in July and August of 2014, while in that

9    safe house in Bulgaria, you and the other co-conspirators

10   caused the German company to wire transfer approximately

11   550,000 euros, or 723,000-plus U.S. dollars, to a bank

12   account that was controlled by the co-conspirators; is that

13   correct?

14   A    Yes.

15   Q    And then August 7th, you and your

16   co-conspirators made a Finish company the victim in terms of

17   their attempting to wire transfer something from the

18   company's bank account to another account in Hungary.

19   Presumably they found out about it because they reversed it,

20   and the funds were returned to the victim; is that correct?

21   A    Yes.

22   Q    And then in August and September of 2014, you and

23   the other co-conspirators focused on as a victim a company

24   in Portugal, which -- and they wire transferred

25   approximately $380,000 to a bank account in China; is that

1      correct?

2            A     Yes, Your Honor.

3            Q     Did you have any idea of where the bank accounts

4      were?  In what countries?

5            A     No.  This was the role of the other

6      co-conspirators.  I didn't know where the banks or the

7      accounts or what was happening with the money.

8            Q     Okay.  But you knew that the money was going into

9      accounts that the co-conspirators controlled?

10           A     Yes.  I knew that they had some accounts, and,

11     yes, that they were using those accounts too.

12           Q     All right.  Then you returned to Romania.  Then

13     you got called, and they needed your help in Prague?

14           A     Yes.

15           Q     And so you traveled to Prague.  Again, thinking

16     that you're going to get the funding for the app, you

17     participated in the role that we talked about in terms of

18     the signatures and the logos, to make these documents appear

19     to be legitimate; is that correct?

20           A     Yes.

21           Q     And then in October, November of 2014, the scheme

22     started from a safe house in Prague and targeted a company

23     in Germany where the German company transferred large sums

24     into bank accounts in Germany into a bank account in

25     Hungary, again controlled by the co-conspirators.

1          You knew that they had bank accounts that they

2     controlled but not where they were or how much money was

3     being transferred; is that correct?

4          A     Exactly.

5          Q     All right.  And then in November 2014, a company

6     wire transferred additional money from an account in Germany

7     to the bank account in Hungary, and they continued to

8     request additional amounts of money to be sent to the bank

9     account in Hungary, and these amounts were over a million

10    dollars, and they began to increase.  And once the company

11    discovered the scheme, then they did not send the last wire

12    transfer; is that correct?

13         A     Yes, that's correct.

14         Q     And then in November of 2014, you and the other

15    co-conspirators -- you targeted a company in Germany.

16    Again, that arrangement was made through your skills with

17    the signatures and working on the logos to have money

18    transferred from a bank account in Germany to one in

19    Hungary.

20         And, again, there's a whole series of different

21    ones.  The scheme moves through -- and I'll just do it in

22    more summary form -- in November false representations.

23    Additional amounts were transferred from an account in

24    Germany to the co-conspirators' account in Hungary.

25         In December, there were additional amounts that

1    were transferred to the bank account in Hungary controlled

2    by the co-conspirators.

3              There were two transfers in December -- three

4    transfers -- all from this bank account in Germany to the

5    account in Hungary.

6              Then there was additional -- from this Victim 4,

7    an account in Germany to a bank account in China that had

8    been provided by the co-conspirators.

9              Eventually you left Prague.  You went back to

10   Romania.  And, again, you were told to keep your cell phone

11   on so you would be contacted, and you did get a contact from

12   Ciomag asking you to come to Poland.

13             So, again, thinking you were going to get your

14   funding, you went to Poland at a safe house.  Evidently, the

15   co-conspirators were unable to defraud any of the companies

16   that were there.

17             So they then moved back to causing a German

18   company to wire transfer money from a German bank account in

19   Poland that was provided to -- provided by one of the

20   co-conspirators, and money was transferred to counts where

21   the co-conspirators controlled them.

22             So are you agreeing with all of that?  I'm just

23   going through it.

24        A    Yes.  Yes, Your Honor.

25        Q    And then you were in Bratislava, in a safe house,

1    and there law enforcement arrested CC10, but you and Ciomag

2    were able to flee the location and not be arrested; is that

3    correct?

4        A    Yes.

5        Q    And you then didn't have any contact with them

6    after that time, which would've been sometime in March of

7    2015, I take it, or at least in 2015, and you also never got

8    the money; is that correct?

9        A    Yes.  Yes, Your Honor.

10       Q    All right.  Anything that I need to know

11   additionally beyond what you've told me?

12            MR. CARNEY:  Your Honor, I would just --

13            THE COURT:  If you could move over to the

14   microphone so we make sure -- in terms of if there's a

15   defense or some additional information.

16            MR. CARNEY:  Your Honor, it's not additional

17   information.  What it is, is that on some of -- as it's

18   clear on some of these things, like the date somebody was

19   being arrested or that, he does not dispute it.  He just

20   doesn't have exact information.

21            THE COURT:  Sure.

22   BY THE COURT:

23       Q    All right.  In terms of the elements of the

24   offense of the conspiracy, you entered into an agreement

25   with at least one other person to commit the offense of wire

1    fraud.  And there's at least -- I think there's six

2    co-conspirators, although you initially may not have known

3    exactly what they were doing, eventually you did and

4    continued to participate in it realizing that these

5    companies were being defrauded out of large sums of money

6    into accounts run by the co-conspirators; is that correct?

7         A    Yes.

8         Q    And you went back to Romania each time after each

9    one of these sort of, I guess, episodes in different

10   countries.  You were called, and then you went back.  So you

11   never withdrew or refused to do it; is that correct?

12        A    Yes, I didn't.

13        Q    Okay.  And that you knowingly participated, in

14   other words, you eventually knew what you were doing.  This

15   wasn't a mistake on your part or inadvertent or anything?

16        A    No.  Yes.

17        Q    Okay.  And you participated in terms of the role

18   that you had with the intent of assisting in committing this

19   fraudulent scheme; is that correct?

20        A    Yes.

21        Q    You have to have an overt act, and I think each of

22   the attacks in terms of these various companies that have

23   been listed, you were copying signatures of the high-level

24   executives and working on the logos all to make it appear

25   that these were legitimate contacts that were being made

1    with these employees who controlled the bank accounts; is

2    that correct?

3         A    Yes.

4         Q    Okay.  And you knowingly and willingly entered

5    into the scheme; is that correct?

6         A    Yes.

7         Q    And it was an interstate or international wire

8    communication.  So we have the use of the domain names,

9    emails in the United States, the victims -- the emails that

10   were sent to the victims that went through the domain name,

11   and then they were either interstate or international; is

12   that correct?

13        A    Yes.

14        Q    All right.  Then I'll find that the Government has

15   made a proffer beyond a reasonable doubt for the offense of

16   conspiracy to commit a wire fraud, and you have agreed and

17   made admissions that also meet those elements.

18             All right.  Then let me proceed to pick up on the

19   rest of this.

20             I'll indicate both the Government's evidence and

21   the defendant's admissions match the evidence with the

22   elements for the offense.

23             Now, you have the plea letter.  Do you have that

24   in front of you?

25        A    Yes.

1      Q      Okay.

2      A      I have that.

3      Q      Did you read it over carefully?

4      A      Yes.  I read it together with Mr. Carney.

5      Q      Okay.  Did you understand it?  Did you need any

6   assistance understanding what was in there?

7      A      I needed Mr. Carney's assistance to understand,

8   but I understood most of the information, all of the

9   information, actually.

10     Q      Okay.  So let me go over the letter.  I'm going to

11  skip around and do things a little different.  I'm going to

12  start with the statutory penalties that are involved in

13  this.  So the conspiracy to commit wire fraud, the maximum

14  sentence from the statute -- and the Court cannot sentence

15  you above that; it would be an unlawful sentence -- the

16  maximum sentence of jail is 20 years; a maximum fine is

17  $250,000, or two times the gross gain or loss; supervised

18  release.  Supervised release is if you're given a period of

19  jail time and then you're given a period that you're

20  supervised in the community to make sure that you don't

21  continue to commit any crimes, and there's various

22  conditions the Court can set.  That supervised release, I

23  cannot sentence you to more than three years of that.

24          You should know that while you're on supervised

25  release, if you commit a new crime or don't follow through

with the conditions, the supervised release can be revoked

and a new sentence can be imposed.  Depending on why it's

being revoked, new criminal conduct or you're not following

through with the conditions that have been set, a new

sentence is determined both statute and the advisory

sentencing guidelines.  And you do not get credit for any

period of time you may have already been locked up; in other

words, that's a separate sentence, but the two sentences

together cannot be more than the statutory maximum.  All

right?

        A    Yes.

        Q    And then you will also have to pay $100 special

assessment.  The Court cannot waive that.  So at some point

you need to pay that.

             There is mandatory restitution, which repayment to

a victim, and there's also a forfeiture, and these are two

different things.  And the forfeiture is basically proceeds

associated with the scheme, and they've requested a money

judgment.

             So is that your understanding of sort of the

statutory requirements in terms of a sentence?

        A    Yes, I understand.

        Q    All right.  Let me go through, then, the advisory

sentencing guidelines.  That's in a later place, but I sort

of combined them together.  I think it's easier to

1    understand.  So I've already talked about the statutory

2    penalties, and I cannot sentence you above the statutory

3    maximum as I've set them out.

4              In the sentencing, the Court has to consider

5    certain factors, and they're under statute.  It's 18 U.S.C.

6    3553(a) and other sections, and what it is is things like

7    the seriousness of the offense, whether you need

8    rehabilitation, deterrence, punishment, deterrence to you,

9    to others, your background, any needs that you may have,

10   rehabilitation.  Those kinds of things.  That's sort of the

11   umbrella.  Then within that, the Court is given some

12   information in a presentence report.

13             The probation office prepares a report.  It sets

14   out the offense.  It sets out the calculation of the

15   advisory sentencing guidelines, which there's a sentencing

16   commission that sets out guidelines.  Now, they're advisory.

17   They're not mandatory.  So the Court is not required to

18   follow them, but the Court is required to calculate them

19   correctly, and the Court is required to either sentence

20   within them or give a very detailed explanation as to why

21   I'm not doing that.  Okay?

22        A    Yes.

23        Q    And the presentence report will give background

24   information about you, any criminal offenses, your family

25   background, education, job employment issues, health,

1    physical health, mental health, drug abuse, or anything of

2    these natures and your financial information.  And they will

3    make certain recommendations.  And, importantly, they do the

4    calculation of the advisory sentencing guidelines, and

5    that's the official one.

6         A    Yes.

7         Q    Now, in the plea agreement is one where the

8    parties think this would be it, but really the one that

9    comes from the probation department and the presentence

10   report is the official one.

11             Now, you and the Government will get this

12   presentence report before I get it, and you and your counsel

13   and the Government can object to things that are in the

14   presentence report either claiming it's not accurate, the

15   factual information, or that the calculation is not correct.

16   And the presentence report, where I will consider it, will

17   either change it or not change it; indicate what the

18   objection is and why they didn't change it.  Then it will

19   come to me.  And if there are objections that have not been

20   resolved, then I will resolve them before the sentence.  All

21   right?  Do you understand all of that?

22        A    Yes, I do.

23        Q    And you've had an explanation of that?

24        A    Yes.

25        Q    Okay.  So then let me move to the advisory

sentencing guidelines in your case.  The offense level is basically the characteristics of the offense.  If you're a leader, various issues that come up with the offense where you add points, and it's all based on points.

So the base offense is 31 points.  Because the fraud amounted to $9.5 million, there's an additional 20 points.

There are more than 10 victims, so there's an additional 2 points.  And the fraudulent scheme is -- and the use of the wire fraud was a sophisticated scheme, so you get an additional 2 points.  So that totals 31.

If you continue to accept responsibility, there's 2 points.  If you also continue, and the Government needs to file a motion, you may get a third point at which point it would be 28.

You look at criminal history, convictions, United States convictions, and you would look at the crime involved, the sentence, and what kind of a sentence.  My understanding is that you do not have a record, so you would be criminal history category 1.

So criminal history category 1, offense level 28. The range would be 78 to 97 months.  The fine would be 25,000 to 250,000.

So does that sound familiar as well?  Do you understand it?

1        A    I understand.

2        Q    All right.  Once you calculate that, under the

3    advisory sentencing guidelines, there is a way to have your

4    sentence reduced, or it can be departed upwards, but

5    everybody has indicated in the plea agreement that, except

6    for one departure downward that may apply, there's no basis

7    to depart upward or downward.  Depart upward is usually the

8    criminal history doesn't reflect how serious the convictions

9    or something of that nature.

10        So the one that would apply to you, or you would

11    be interested in, is 5K1.1, which is providing substantial

12    assistance, and it's the Government who makes the decision,

13    not the Court.  Your counsel cannot force them in any way to

14    file with the Court a motion indicating that you've provided

15    substantial assistance.

16        There's a committee within the U.S. Attorney's

17    Office that looks at this.  They make a decision as to

18    whether it will be provided.  It may be that you provided

19    assistance, but they don't decide it's substantial.  They're

20    the ones who make that decision.  So I can't review it.

21        If they do decide that you should have that

22    consideration, they'll file a motion to depart, which is a

23    departure down, which would be to lower your sentence.  And

24    the Court, within the sentencing guidelines, under 5K1.1,

25    could sentence you below the criminal history 1, offense

1    level 28, to 78 to 97 months.  So that's within that scheme.

2            Now, the guidelines are advisory.  They're not

3    mandatory as I've said.  So the Court could decide as an

4    alternative to sentence you to what we call a variance.  So

5    I would need to explain it in detail as to precisely why I'm

6    doing it, not following the advisory sentencing guidelines,

7    and I could give you a different sentence.  The sentence

8    could be a greater sentence or a lesser sentence.

9        A    Yes.

10       Q    Do you understand that?

11       A    I understand.

12       Q    All right.  Let me move back to the letter for a

13   second.  I've moved things around.  I just think it's easier

14   to hear it all at once.

15           All right.  So if you're looking at the letter,

16   we're on page 2.  It's indicated that they will not be

17   bringing any additional charges based on the proffer that's

18   been provided.  You won't be charged also for any nonviolent

19   acts that you committed within D.C. in terms of before this

20   agreement and about which they would not have known.

21           But if for some reason, which they don't have any

22   information, you were involved in a crime of violence, then

23   they would be able to charge you.  Do you understand?

24       A    Yes, I understand.

25       Q    Now, the bottom of 2 really through 3 talks about

1    just what I did in terms of the advisory sentencing

2    guidelines.

3              Now, there is one thing in paragraph B, the second

4    paragraph, is they may decide not to file the adjustment for

5    acceptance of responsibility arguing for an obstruction of

6    justice or whatever.

7              If you move to withdraw your guilty plea, or they

8    decide that you've either engaged in conduct they didn't

9    know about, that is considered obstructing justice or

10   engaged in any criminal conduct.  Do you understand?

11        A    I understand.

12        Q    So you're a known foreign national, so no one is

13   considering any kind of conviction should you have any.  It

14   would only be in the United States.

15             So page 4 gets into the estimated guideline range,

16   which I talked about.  It indicates that neither party is

17   going to seek any departure or adjustment other than what

18   we've talked about, which is the 5K1.1.  And the Government

19   is preserving their right to make recommendations at the

20   time of sentencing.  And you're agreeing that the estimated

21   guideline range, which is what I just went over, would be a

22   reasonable sentence in light of those factors that I talked

23   to you about at the beginning under 3553(a).  But you're

24   reserving the right to ask for a sentence below those

25   estimates, again, relying on the 3553(e), and the Government

1     also makes that same reservation.

2             On page 5, it's reserving at the top there that if

3     the Government has agreed not to ask for certain things or

4     recommend certain things, that they -- if there's any

5     post-sentence motion, in other words, after the sentence you

6     filed some motion, then they can make whatever arguments and

7     not be bound by what was in the agreement.  Do you

8     understand that?

9         A    I agree.

10        Q    Also, they don't intend to file a downward

11    departure under the Federal Rules of Criminal Procedure

12    35(b).  And that relates to you're sentenced, and

13    occasionally people provide additional assistance, and the

14    Government, and only the Government can do this, files a

15    motion under Rule 35 to further reduce the sentence you've

16    already been given.  Do you understand?

17        A    I understand.

18        Q    But they're indicating to you up front they're not

19    going to -- they have no intention of doing that.  Do you

20    understand?

21        A    I understand.

22        Q    And, obviously, this is an agreement between the

23    parties.  It doesn't bind the Court.  So I will be making

24    independent decisions.

25             Also, you will have no right to withdraw the plea

1    if I sentence you to one that's outside the sentencing

2    guideline or I don't follow either yours or the Government's

3    recommendation.  You're still going to be bound by the

4    agreement.  Do you understand and agree?

5         A    I understand, yes.

6         Q    Okay.  You have to say something orally.  Nodding

7    doesn't show up on the record.

8         A    Okay.

9         Q    All right.  I've already talked to you about the

10   conditions of release.

11             So why don't we look to page 6, which talks about

12   your cooperation.

13             You're expected to cooperate fully, truthfully,

14   completely.  There's various ways they may want you to

15   cooperate, but it could be such as providing -- certainly

16   answering questions, giving sworn, written statements,

17   taking government-administered polygraph examinations.  Do

18   you know what that is?

19        A    Yes.

20        Q    Okay.  And maybe participating in some covert or

21   undercover activity.

22             If you refuse to cooperate with what they're

23   asking you to do, that will be viewed as a breach of your

24   agreement, and their obligations under the agreement, they

25   won't have to follow them, but you still will be -- you

1   won't be able to withdraw your guilty plea, and you'll still

2   be required to follow through with your end of the bargain.

3   Do you understand and agree?

4        A    I understand.

5        Q    You're expected to turn over to the Government any

6   evidence of crimes or any proceeds from those crimes.  And

7   you'll be interviewed also by law enforcement or attorneys,

8   and ordinarily you would be able to have your counsel

9   present, and you've agreed that they can talk to you without

10  your counsel present.  But if you decide at some point you

11  want him present, then if you put it in writing so there's

12  no misunderstanding that you're asking for it, then they

13  will have counsel present, and there's no negative

14  consequence to that.  Do you understand those things?

15       A    Yes, I understand.

16       Q    And you're agreeing to that?

17       A    And I agree, yes.

18       Q    All right.  You're also agreeing to testify

19  completely and truthfully in front of a grand jury in terms

20  of bringing charges against others or other trials anywhere

21  where your testimony might be relevant from the Government's

22  perspective.  Do you understand and agree?

23       A    Yes, I understand.

24       Q    And, of course, you can't commit any new criminal

25  offense, whether it's a local or a federal, while you're

cooperating.  And if you do that, that, again, will be
considered a breach of the agreement.  You've broken your
end of the bargain.  The Government no longer has to follow
through on their end.  You won't be able to withdraw your
guilty plea, and you will still be required to follow
through with your obligations.  Do you understand and agree?

        A    Yes, Your Honor.

        Q    All right.  A couple of waivers.  In other words,
you're, again, giving up certain rights.  The statute of
limitations.  Certain crimes have time limits, and the
Government has to charge you within that time limit; in
other words, they can't -- as long as you're pleading guilty
within a time limit that has been set out by statute where
you can be charged, then, if at a later point for some
reason your plea is vacated, made null and void for some
reason, then if the time for the statute of limitations has
run between the time and your plea and sentencing and when
this occurs, you can't raise as a defense.  The statute of
limitation has run.  They can still charge you again and
proceed.  Do you understand and agree?

        A    I understand and agree.

        Q    All right.  I've gone over the trial rights.  The
only one I bring up again is -- or additionally -- is that
you're agreeing to give up the right for any further
discovery or disclosures of information that have not

1    already been provided to you.  So you're making a decision

2    based on what they gave you up to date; is that correct?

3         A    That's correct.

4         Q    And you're agreeing to that?

5         A    I agree, yes.

6         Q    So there may be other information, and you're

7    agreeing that -- you're pleading guilty based on what

8    they've given you at this point?

9         A    Yes.

10        Q    Now, page 8 talks about certain rules about limit

11   the admissibility of your statements during plea discussions

12   or plea proceedings if your guilty plea is later withdrawn.

13             So, in other words, under the rules, if it's

14   withdrawn, they can use your statements, even the ones from

15   today, to impeach you if you took the stand.  And if you had

16   contrary, inconsistent testimony, they can use it to impeach

17   you.  But you're giving up that right so that if the plea is

18   withdrawn, they can use all of this information against you.

19   Do you understand?

20        A    I understand.

21        Q    And you're agreeing to that?

22        A    And I agree.

23        Q    And you and Mr. Carney spent some time on that, I

24   hope?

25        A    Yes.  We spent some time, and we went over each of

1      the clauses of this agreement.

2          Q    We went over the appeal rights.

3              Bottom of eight is a collateral attack, which

4      means not a direct appeal but other ways of attacking a

5      conviction.

6              28 U.S.C. 2255, it's basically like a writ of

7      habeas corpus, to be brought to the Court because you have

8      been unlawfully charged and convicted.

9              Civil Procedure 60(b) is that you can ask to alter

10     or modify the judgment.  Usually new evidence or ineffective

11     assistance of counsel are usually the grounds for that, and

12     they've indicated here.  There may be other grounds, but you

13     are agreeing not to proceed under that except if you find

14     new discovered elements, that would change your plea, or

15     you're claiming that you didn't receive effective assistance

16     of counsel.  All right?

17         A    Yes.

18         Q    And, additionally, you're reserving the right to

19     proceed under 18 U.S.C. 3582(c)(2).  If the sentencing

20     guidelines change and become more favorable to you at a

21     later point, you are allowed to file a motion to have your

22     sentence modified.  But if I deny it, you are giving up your

23     right to appeal.  Do you understand that?

24         A    Yes, I understand.

25         Q    The Freedom of Information Act and Privacy Act.

1    You or somebody on your behalf could request information,

2    documents, and you're agreeing that that won't happen, to

3    request records that pertain to your investigation or

4    prosecution of this case.  So you cannot ask for documents

5    associated with the prosecution or investigation.  Do you

6    understand and agree?

7            A    Yes, I understand, and I agree.

8            Q    All right.  Restitution is mandatory in this case,

9    so it's not -- sometimes restitution is discretionary, and

10   the Court makes the decision whether to impose restitution

11   requirements, but here it's mandatory.  It talks about all

12   of the information you're going to be providing, financial

13   information for them to make a decision as to what it should

14   be, and you're required -- and there's penalties if you

15   don't fill it out accurately.  Generally, they're due

16   immediately, although the Court can set out a payment

17   schedule if you do not have it.  And those payments are

18   related to the restitution to the victims, and they have to

19   show that the proceeds that -- well, take it back.  That's

20   the forfeiture.

21           The restitution is the amount of loss to the

22   victims in terms of how they calculate it, and it has to be

23   tied to the fraudulent scheme itself.  And at this point, we

24   don't have a particular amount.

25           Presumably the Government will file and indicate

1    what it is; is that correct?

2            MR. MARANDO:  Yes, Your Honor.

3    BY THE COURT:

4        Q    So at this point, you're agreeing to plead guilty

5    and to pay restitution in an unnamed amount; however, you

6    will be able to challenge it if you feel that it's, you

7    know, not appropriate or unfair or doesn't meet the

8    requirements.

9            Do you understand and agree?

10       A    I understand, and I agree.

11       Q    All right.  Now, forfeiture is something totally

12   different, although they've agreed that if they ask for a

13   certain amount for forfeiture and restitution, that the

14   amount can be used for both.  Now, it may be that the

15   Justice Department, in another section, will not agree to

16   that, so you may be left having to pay restitution and

17   forfeiture amount.  They go to different things:

18   Restitution is the victim, and forfeiture is basically

19   getting back proceeds that you've had from your criminal

20   conduct.  So there's a different purpose for them even

21   though the amount may turn out to be very similar or the

22   same.

23           Now, you're agreeing without knowing, again, what

24   the amount is going to be to a money judgment.

25           Again, you're agreeing to the forfeiture.  So

1    you're agreeing that there will be a money judgment.  You

2    can contest how they come up with the money and judgment

3    itself.  In other words, they're asking for it.  They need

4    to show if you object to it, how they came up with the

5    figure so you can object to that, not to having the

6    forfeiture imposed.  Do you understand and agree?

7         A    I understand and agree.

8         Q    And so they're going to rely on the proffer that

9    was made, the statement of offense, to come up with what --

10   and they usually have sort of, like, a formula that's done

11   in most of the cases.  So there's some uniformity with it.

12   And the forfeiture, they would look at your assets,

13   personal, whatever, which they view as constitutes or

14   derived from proceeds, which is the money that's traceable

15   back to your criminal conduct.  Do you understand and agree?

16        A    I understand and agree.

17        Q    And there's various ways of forfeiting.  You can

18   do civil, you can do criminal, you can do it

19   administratively.  I mean, there's various ways of doing it,

20   and they will be the ones making this decision.  Do you

21   understand and agree?

22        A    I understand and agree, Your Honor.

23        Q    All right.  You're waiving, in other words, giving

24   up any constitutional or statutory challenges to the manner

25   in which the forfeiture is carried out, including any direct

1    appeal, including that the forfeiture constitutes an

2    excessive fine or punishment.  Do you understand and agree?

3         A    I understand and agree.

4         Q    All right.  G I just went over.

5              Immigration consequences.  You've stipulated to a

6    judicial order of removal; in other words, you're agreeing

7    to be deported, and they do not have to go through a court

8    proceeding or an administrative proceeding in order to

9    deport you.  Once your sentence is completed, you've agreed

10   to be deported.  I don't know whether it's back to Romania,

11   but certainly you would be deported, and you would leave

12   here.  Usually there are certain rights relating to a notice

13   and a hearing and various other things before you could be

14   deported.  You're giving up all of those rights, and you're

15   agreeing -- as soon as the sentence is done, you can be

16   deported.  Do you understand and agree?

17        A    I understand and agree.

18        Q    And have you spent some time talking about this

19   with your counsel?

20        A    Yes.  We also talked about this.

21        Q    So you're waiving your rights to the protections

22   under removal, deportation, exclusions.  And these include

23   rights, but not limited to, to apply for relief, which you

24   would ordinarily be able to do to protect you from being

25   removed from this country.

```
 1              A voluntary departure, asylum, asking for asylum,
 2    withholding of deportation or removal and requesting it,
 3    cancelation of the removal, suspension of the deportation,
 4    any kind of adjustment of your status in this country or
 5    protection under the Convention against Torture.  Do you
 6    understand?  So you're giving up your rights to ask to stay
 7    here and not be removed based on various provisions that
 8    could allow to you stay here.  Do you understand and agree?
 9         A    Yes, Your Honor, I understand and agree.
10         Q    And you're agreeing to assist in your removal; is
11    that correct?
12         A    Yes, that's correct.
13         Q    All right.  And then the interpreter we talked
14    about, about having a certified interpreter.  You've
15    indicated that you understand English, although it's not
16    your first language, but I must say that you speak it very
17    well for somebody who has learned it on their own and not in
18    school.
19         A    Thank you, Your Honor.
20    BY THE COURT:
21         Q    But we've had somebody here.  You haven't used her
22    yet, but I wanted to make sure that there wasn't any concern
23    since these agreements are fairly complicated.
24              So at this point, have you understood everything?
25    Do you need to talk to the interpreter about anything?
```

1          A    No.  No.

2          Q    All right.  If you breach the agreement, in other

3    words, you break your end of the bargain in terms of

4    following through with your obligations, or you engage in

5    new criminal conduct before sentencing, then you will have

6    broken your end of the bargain, breached your agreement.

7    There are certain consequences to that.  The Government is

8    free from their obligations.  You will not be able to

9    withdraw your guilty plea.  You'll be subject to any

10   criminal prosecutions should you commit any new crimes.

11   There will not be a motion under 5K1.1 to get you out of the

12   advisory sentencing guidelines.  The Government is free to

13   use against you, directly and indirectly, any criminal or

14   civil proceeding all of the statements that you will have

15   made, including plea or any other even if they were

16   considered off the record, and you will be required to

17   follow through with your obligations.  Do you understand?

18         A    Yes, Your Honor.

19         Q    And you agree?

20         A    And I agree.

21         Q    In terms of a breach, they would have to prove the

22   standard or burden would be preponderance of the evidence.

23   Now, that's lower than beyond a reasonable doubt, which is

24   criminal.  Preponderance of the evidence is the standard or

25   burden in a civil case.  Do you understand and agree?

1          A     I understand and agree.

2          Q     All right.  In terms of the Government's

3    obligations, they will be required to bring your

4    cooperation, or lack of it, to my attention.  It also talks

5    about the departure committee that will consider what you've

6    done, and they will make a decision whether it's substantial

7    assistance.  And there are instances where you provided

8    information and they don't view it as sufficiently

9    substantial, or you may not be able to provide information

10   even though you're eager to do so and you still don't get

11   this 5K1.1.  Do you understand that?

12         A     I understand that.

13         Q     All right.  You would want this in order to get a

14   lesser period of incarceration, and only they control this.

15   The Court doesn't.  Your counsel doesn't.  So that if they

16   don't file it, the Court cannot depart downward within the

17   advisory sentencing guideline scheme.  Do you understand and

18   agree?

19         A     I understand and agree.

20         Q     All right.  In terms of witness protection, if you

21   request it, and they consider it appropriate, then

22   they'll -- in terms of the U.S. Attorney's Office -- would

23   sponsor you for acceptance into the witness security

24   program, which is part of a program in the United States

25   Department of Justice.  They are the ones who make this

1    decision, not the U.S. Attorney's Office.  And if you get

2    accepted, then you'll have to follow the rules and

3    regulations of the Department of Justice and their Witness

4    Security Program.  Do you understand and agree?

5        A    Yes, I understand and agree, Your Honor.

6        Q    All right.  Are there any other agreements?

7    Remember I said at the beginning, is there anything else

8    that we haven't brought up that you think is part of the

9    agreement?

10       A    No.

11       Q    All right.  Do you understand that it binds only

12   the criminal and superior court divisions of the U.S.

13   Attorney's Office of the District of Columbia?

14       A    Yes, I understand.

15       Q    And it doesn't bind the civil division or other

16   U.S. Attorney's Offices or any other state or local

17   prosecutors.  Do you understand?

18       A    I understand.

19       Q    All right.  A few more questions of mine.

20            I went over those advisory sentencing guideline

21   ranges that are in the plea letter.  Is that a discussion

22   you had with your counsel?

23       A    Yes, I had this discussion.

24       Q    And do you understand that I won't be able to

25   decide what the advisory guideline sentence is in your case

1   until after I actually get the presentence report?

2       A    Exactly.

3       Q    And that will be the official one in terms of at

4   least starting to look at it.  Do you understand?

5       A    I understand that.

6       Q    And do you understand that after I've decided what

7   guideline applies, I have the authority, in some

8   circumstances, to impose a sentence that's more severe or

9   less severe than the advisory guidelines?  And those are the

10  departures I talked about.

11          Do you also -- you have to say something.

12      A    I understand that.

13      Q    Do you also understand that the Government is

14  considering filing this motion for your cooperation?  It's

15  their decision whether to file it, and neither your lawyer

16  nor I can force them to file it?  And if they do file it, I

17  will make the final decision on it.  Do you understand and

18  agree?

19      A    I understand and agree.

20      Q    Do you also understand that parole has been

21  abolished?  I don't know whether you know what parole is.

22  You probably saw it in the old movies, but parole is you do

23  a period of incarceration, and then your sentence -- you

24  would be in the community on parole but you would still be

25  serving your sentence.  So it's not like supervised release.

1    They don't do that anymore.  If you get a sentence to be

2    served in jail, that's the sentence you serve minus good

3    time, which the Bureau of Prisons actually controls, not the

4    Court.  Do you understand?

5         A    I understand, yes.

6         Q    Now, this is a felony offense, and so if I accept

7    it, there are certain rights that you give up.  Since you're

8    not a citizen, the rights of voting, public office, and a

9    jury would not be available to you anyway, but the right to

10   possess any kind of firearm or ammunition, it doesn't matter

11   whether you're a citizen, under the federal law, as a

12   convicted felon, you cannot possess a gun or ammunition.

13   Even if you lived in a state where you can get a license,

14   under the federal law, you can't.  Do you understand and

15   agree?

16        A    I understand and agree.

17        Q    Okay.  A couple questions about the voluntariness.

18   I need to find that you're doing this knowingly and also

19   you're doing it -- in other words, you understand what

20   you're doing, and you're doing it voluntarily.

21             So has anyone, including your lawyer, the

22   prosecutor, law enforcement, or anybody else that you've

23   come in contact with since your arrest promised or suggested

24   to you that just by pleading guilty, that you are guaranteed

25   a lighter sentence?

1       A       No.  No, Your Honor.

2       Q       Has anyone forced, threatened, or coerced you any

3    way into entering this plea of guilty?

4       A       No, Your Honor.

5       Q       Do you understand that the agreement reached in

6    this case resulted from negotiations between your lawyer and

7    the Government lawyer?

8       A       Yes, I understand.

9       Q       Has anyone made any promises to you in connection

10   with your guilty plea other than those in the plea letter or

11   what we've talked about in open court?

12      A       No, nobody made me any promises.

13      Q       Has anyone made any promises to you as to what

14   sentence I'll impose if I accept your guilty plea?

15      A       No.

16      Q       And do you understand that, at this time, I don't

17   know what sentence I'll impose because I haven't gotten the

18   presentence report, nor have I heard from the lawyers and

19   from you.  Do you understand that?

20      A       I understand that.

21      Q       Are you entering this plea of guilty voluntarily

22   and of your own free will?

23      A       Yes.  Yes, Your Honor.

24      Q       And are you entering this plea of guilty because

25   you are guilty?

1        A    Yes.

2        Q    Anything you don't understand, anything you want

3   to ask your lawyer, or anything you want to ask me?

4        A    No, Your Honor.

5        Q    All right.  Was there anything along the way that

6   you didn't understand or wanted to consult with your lawyer

7   and you did not do so at that time, because you can do so

8   now.

9        A    No, no, no.  I understand everything, and we

10  talked about it previously.

11       Q    All right.

12       A    Yes.

13       Q    Then Cristian Flamanzeanu, how do you plead to the

14  charge of conspiracy to commit wire fraud?

15       A    Guilty.

16       Q    All right.  And to the forfeiture charge, are you

17  agreeing to the forfeiture?

18       A    Yes, I agree.

19       Q    All right.  I'm satisfied the defendant,

20  Cristian Flamanzeanu, is fully competent, capable of making

21  a decision, understands the nature and consequences of what

22  he's doing, acting voluntarily of his own free will, and

23  there's an adequate factual basis for his plea; therefore,

24  the plea is accepted and the Court finds

25  Cristian Flamanzeanu guilty of Count 1 of the indictment,

1    conspiracy to commit wire fraud, and that he's agreed to the

2    forfeiture.

3         All right.  Let me just look at the paperwork for

4    a second.

5         You can go ahead and sit down.

6    A    Thank you, Your Honor.

7         THE COURT:  Okay.  I have the two statements of

8    offense, one to be filed under seal, and both are signed.  I

9    have the plea letter which has already been signed.  I have

10   the waiver, which I will sign now, trial by jury.  And I

11   have a consent order of forfeiture, which does not have an

12   amount in it.  Am I correct?

13        MR. MARANDO:  That's right.

14        THE COURT:  In other words, as I mentioned to you,

15   Mr. Flamanzeanu, you're agreeing to a forfeiture.  This is a

16   consent order to start with, which you've signed.  And then

17   prior to sentencing -- and I would ask that at the time

18   you're filing your motions regarding the sentencing, I would

19   ask that you give notice as to whether you've agreed to an

20   amount or it's a contested amount and what it is so I don't

21   get to the sentencing and, you know, not know whether we're

22   going to have a hearing or anything about it.

23        Okay.  Since it appears that he's going to be

24   cooperating, are we doing a status, or who how are we

25   handling the case?

1     MR. MARANDO:  Yes, Your Honor.  The Government

2  would respectfully request a status hearing.

3     THE COURT:  All right.  Give me a moment.

4     Did I understand correctly that Mr. Flamanzeanu

5  was paid, like, a monthly fee while he was working with

6  them?

7     MR. MARANDO:  Yes, Your Honor, but we believe it

8  was just for the first safe house when he was in Turkey.

9     THE COURT:  So there would've been other funds

10  after that?

11     MR. MARANDO:  It would've been almost, like, a

12  per diem type of -- they would pay for his food if he needed

13  it.

14     THE COURT:  Okay.

15     MR. CARNEY:  Your Honor, the initial agreement,

16  from my understanding, was he was to be paid $3,000 of

17  travel and food and lodging, and he was paid the first time

18  a sum where they took deductions for his travel from that

19  amount; thereafter, he wasn't paid.  The idea was that he

20  was to get money for assistance for his application programs

21  and things.

22     THE COURT:  Okay.  So they sort of gave him --

23  they gave him an expense but not a salary or an amount while

24  he was hoping to get his app, I take it?

25     MR. CARNEY:  Right.

1          THE COURT:  Okay.  All right.  So what are we

2     looking at?  How far do you want to put this?

3          MR. MARANDO:  Your Honor, actually, my co-counsel

4     made a good point.  It would be smart if we could have our

5     status hearing after Daniel Ciomag's status hearing.

6          THE COURT:  Sure.

7          MR. MARANDO:  We just thought of that.  And,

8     unfortunately, I don't have it offhand when his next status

9     hearing is, and I'm sorry to surprise the deputy.

10          THE COURT:  Okay.  We can --

11          MR. MARANDO:  It's the same case number.

12     16-CR-163-4.

13          MS. LUCAS:  Actually, it was August 4th.  The

14     Court -- if I may.  We should probably do it sometime in

15     September.

16          THE COURT:  Do it sometime in September?  That's

17     fine.  I'm in trial now, so it works better.  I've only got

18     a couple of days -- this happened to be one of them -- that

19     I've taken off from the trial itself.  It's a long one, so I

20     just assume do something in September.

21          So do you want it early on?  Later?  Tell me when

22     in September.

23          MR. MARANDO:  I think later makes the best sense,

24     Your Honor.

25          THE COURT:  Okay.  The week of September 11th to

1    the 15th, I don't want to do that week, but I can do

2    others.

3              MS. LUCAS:  How about the week of the 29th or

4    the week of September 25th?

5              MR. MARANDO:  That works.

6              THE COURT:  Okay.  We could do it in the morning.

7    I have a criminal case in the afternoon, but it's not one of

8    these.  So 10:00 on the 29th?

9              MR. CARNEY:  That's good, Your Honor.

10             MS. LUCAS:  That will be good.

11             THE COURT:  So this will be a status at 10:00.

12             I'm sorry.  My paper calendar isn't up to date.

13   That's one of the problems.

14             Hang on one second.

15             How about 11:30 that morning?

16             Do I have anything else?

17             THE CLERK:  Not until the afternoon at 1:00 p.m.

18             THE COURT:  All right.  Okay.

19             MR. MARANDO:  That's fine for the Government.

20             MR. CARNEY:  Yes, Your Honor.

21             THE COURT:  So September 29th at 11:30.  Is that

22   what I said?  Yes.

23             We've been bringing the Romanian interpreter, and

24   I did want for the plea because every once in a while things

25   come up with it, but do you want the person to come to each

1    of these proceedings or not?

2            I think for the statuses I won't.  I will for

3    sentencing.  The bigger events I think it's important to

4    have somebody available in case something comes up that

5    you're not comfortable with because that's what I want to

6    make sure.

7            All right.  So I think for the next one we don't

8    need the interpreter, at least for a status because usually

9    it's where are we and setting another date.  And at the

10   sentencing, we would set a date before that so we would know

11   we would need the person.

12           All right.  Anything else from counsel?

13           MR. MARANDO:  Nothing from the Government, Your

14   Honor.

15           MR. CARNEY:  No, Your Honor.

16           THE COURT:  All right.  Take care.  I'll see you.

17       (Hearing concluded.)

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Richard D. Ehrlich, a Registered Merit Reporter

 4     and Certified Realtime Reporter, certify that the foregoing

 5     is a true, complete, and accurate transcript of the

 6     proceedings ordered to be transcribed in the above-entitled

 7     case before the Honorable Colleen Kollar-Kotelly, in

 8     Washington, D.C., on July 21, 2017.

 9

10     s/Richard D. Ehrlich  March 23, 2018
       _____
11     Richard D. Ehrlich, Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```